Karen M. EMMEL, Plaintiff–Appellee,

v.

COCA-COLA BOTTLING COMPANY OF CHICAGO, also known as Hondo, Incorporated, Defendant–Appellant.

No. 95–3558.

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1996.

Decided Sept. 12, 1996.

Ernest T. Rossiello, Margaret A. Zuleger (argued), Rossiello & Associates, Chicago, IL, for plaintiff–appellee.

Bradford L. Livingston (argued), Thomas J. Piskorski, Robert A. Kearney, Seyfarth, Shaw, Fairweather & Geraldson, Danuta B. Panich, Marcia E. Goodman, Marian C. Haney, Eric Dreiband, Mayer, Brown & Platt, Chicago, IL, for defendant–appellant.

Before ESCHBACH, MANION, and EVANS, Circuit Judges.

MANION, Circuit Judge.

In 1992 the Coca–Cola Bottling Company of Chicago ("Coca–Cola") promoted five men into newly created upper-management positions. Because she was not one of those promoted, Karen Emmel filed a Title VII sexual discrimination complaint. Emmel was then passed over for another set of upper-management positions and filed a second complaint. These two complaints eventually reached a district court jury which ruled that Coca–Cola had violated Emmel's rights when

it failed to promote her. In addition to lost wages of $43,000, the jury awarded Emmel $7,325 in compensatory damages and $500,000 in punitive damages. The district court refused Coca–Cola's motion for a new trial but lowered the punitive damage award to $292,675 so that the total award did not exceed the $300,000 statutory cap. Coca–Cola argues that the evidence does not support the verdict, that the district court erred in denying Coca–Cola a new trial, and that the punitive damages were excessive. We affirm.

## I. Sufficiency of Evidence

### A. Legal Analysis

■ Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to [ ] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1) (1994). Two methods exist for proving that an employer violated this prohibition. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994) (explaining direct and circumstantial evidence in discrimination cases). The first is by direct evidence. This would take the form, for instance, of an employer stating "I did not hire you because you are a woman." Since employers are usually careful not to generate such evidence, see, e.g., *Castleman v. Acme Boot Co.*, 959 F.2d 1417, 1420 (7th Cir.1992) (noting that direct evidence of intent to discriminate is rarely found), the Supreme Court, in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), articulated an indirect burden-shifting approach to proving discrimination cases. Under this method, a Title VII plaintiff has the burden of establishing a prima facie case of unlawful discrimination. The prima facie case requires evidence that she was in a protected class, here a woman; that she was qualified for the promotion; that she did not receive the promotion despite her qualifications; and that a person not in the protected class was promoted instead. Id. at 802, 93 S.Ct. at 1824; *Bruno v. City of Crown Point, Ind.*, 950 F.2d 355, 363 (7th

Cir.1991), cert. denied, 505 U.S. 1207, 112 S.Ct. 2998, 120 L.Ed.2d 874 (1992). Once the plaintiff has established such a case, an inference of discrimination exists and the burden of production shifts to the defendant employer to "clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (emphasis in original) (quotations omitted). Once this burden of production is met, any inference of discrimination evaporates. To prove unlawful discrimination at this stage, the plaintiff must demonstrate to the jury that the reason proffered by the employer was mere pretext, an explanation designed to obscure the unlawful discriminatory employment action. Our review after a trial on the merits is the same whether the evidence is direct or indirect: did the plaintiff prove by a preponderance of the evidence that the defendant intentionally and unlawfully discriminated in the employment practice in question. *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1054 (7th Cir.1990). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Bruno v. City of Crown Point, Ind.*, 950 F.2d at 363 (quoting *Texas Dept. of Community ·Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)).

In this case, Emmel presented both direct and indirect evidence that Coca–Cola violated Title VII. Based on that evidence, the jury found for Emmel. Pursuant to Rule 50(b), Coca–Cola moved for judgment as a matter of law, but the district court denied the motion. Coca–Cola appeals that denial.

■ We review the denial of a motion for judgment as a matter of law de novo. *McNabola v. CTA*, 10 F.3d 501, 515 (7th Cir.1993). Our inquiry is limited to "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." Id. at 515 (quoting *Tapia v. City of*

*Greenwood,* 965 F.2d 336, 338 (7th Cir.1992)). In other words, we are limited to assessing whether no rational jury could have found for the plaintiff. *EEOC v. G–K–G, Inc.,* 39 F.3d 740, 745 (7th Cir.1994). Because witness credibility is often crucial in discrimination suits we apply a stringent standard in reviewing the jury's verdict. *Christie v. Foremost Ins. Co.,* 785 F.2d 584, 586 (7th Cir. 1986). "[W]e are particularly careful in employment discrimination cases to avoid supplanting our view of the credibility or weight of the evidence for that of both the jury (in its verdict) and in the judge (in not interfering with the verdict)." *Hybert v. Hearst Corp.,* 900 F.2d 1050, 1054 (7th Cir.1990).

### B. Evidentiary Analysis

With these standards in mind, we consider the evidence Karen Emmel presented to the jury. Coca–Cola expends considerable effort rearguing why the testimony attributing statements to its officers was not credible and treating evidence it submitted at trial in its defense as the facts controlling the case. It does so despite the clear message from the verdict that the jury did not find that evidence credible. When the losing party moves for a judgment as a matter of law, we view all contested facts in the favor of the nonmoving party. *McNabola,* 10 F.3d at 515; see *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1224 (7th Cir.1995) (warning appellants not to treat contested testimony of losing party's witnesses as facts or risk having brief stricken). In doing so, we must accept Emmel's evidence supporting the verdict as true. The facts set out here are either uncontested or, if contested, are those which support the verdict.

Coca–Cola hired Karen Emmel in 1976. She began her career as an account manager. From there she became a route manager (later known as "district sales manager") in 1981, a supervisory position she held for seven years. There, Emmel directly supervised approximately sixteen employees, and was responsible for training, discipline, and account paperwork for her sales staff and the trade and rental accounts for her route. In 1986 Emmel was recognized as "route man-ager of the year." In 1988 Emmel moved from route manager in the bottle/can division to district sales manager in the syrup division. Coca–Cola Bottling had just purchased the syrup division sight unseen from Coke USA and Emmel moved at the request of the general manager of the new division, Ed Jancauskas. Emmel had no prior experience in syrup sales; the job required that she learn everything about the new division. In 1989, because of her expertise in both syrup and cans, John Walsh, vice president of sales for the north zone [1] offered Emmel the position of cold drink specialist. The position was presented as a positive career move, and required that she maintain exclusive purchase agreements with existing accounts, develop new business, and increase the services provided to Coca–Cola's clients. As a cold drink specialist, Emmel's office was physically located in the front office of the north zone headquarters, between the region managers' offices and across the hall from north zone vice president John Walsh to whom she reported directly through July 8, 1992. Walsh "always had admiration for the work [Emmel did] for the company."

In July 1992 Coca–Cola created five new upper-management positions called area development managers (ADMs). In a memo from Coca–Cola president and CEO William O'Rourke and vice president for company-wide sales, H. Thomas Noxon, the new positions were revealed simultaneously with the announcement of the personnel who would fill them. All five employees promoted to the new ADM positions had considerably shorter careers with Coca–Cola and much less time in supervisory positions than Emmel. Additionally, all five were men. Upon learning she had been passed over, Emmel confronted vice president Walsh and asked for an explanation. He stated first "we just felt these guys deserved promotion." Emmel pressed him further, noting that she had more qualifications and experience than any of those promoted. Walsh said "Let's close the door and speak honestly." Upon doing so he advised, "Karen, you know, as we all know, they wanted men in these positions in the past to run—to have D licenses [a truck

---

1. Coca–Cola divides its bottle/can but not its syr-up division into north and south zones.

driver's license] and to run strike duty." Emmel asked "[W]as I qualified for any of these positions?" to which Walsh replied "You are the only other one qualified." Walsh made no mention of any deficiencies in Emmel's qualifications, the justification Coca–Cola would later offer at trial for passing over Emmel. After trying unsuccessfully to speak with O'Rourke and Noxon, Emmel filed a complaint with the EEOC which evolved into the lawsuit before us. After Emmel filed suit, in September 1993, Coca–Cola announced the creation of three new upper-management "key account executive positions." The announcement, again in the form of a memo from the company president and vice president, announced three male employees who were being promoted into the new positions. Two of them were men who had been promoted to ADM in July of 1992 despite considerably less time with Coca–Cola and less supervisory experience (even with the additional year and two months in their ADM position). The third, who had only been with Coca–Cola since February 1990, was promoted to key account executive directly from district sales manager, a supervisory position he had held for just over two years. The key account executive promotions created two newly-open ADM positions. Despite Walsh's earlier statement that she was "the only other one qualified," Emmel was promoted to neither position. One went to a district sales manager (a supervisory position) and the other to a cold drink representative (a non-supervisory position), the same position held by Emmel. The latter promotion went to an individual with only one year and three months in a supervisory position, all prior to serving, like Emmel, as a cold drink representative.

Because she was again passed over for positions for which she felt she was more qualified, Emmel filed another complaint with the EEOC, which was eventually consolidated into this lawsuit by way of an amended complaint.

## C. Emmel's Direct Case

Emmel's direct case is built on Walsh's statement to Emmel that despite being "the only other one qualified" for the new ADM position, she was not promoted to one of the positions because "you know, as we all know, they wanted men in these positions in the past to run—to have D licenses and to run strike duty." This directly implicates the ADM promotions of July 1992 and indirectly implicates the ADM promotions of September 1993. If Emmel was "the only other one qualified" at the time of the earlier promotions, absent any evidence to the contrary, she was still qualified the following year when she was again passed over. Walsh's explanation also accounts for her not receiving a promotion to the new key account executive positions in 1993. Walsh was involved in all three sets of promotions; he recognized what "they wanted"; he acted in conformity with what "they wanted" in 1992; and the jury could conclude—as it did—that he continued to act in conformity with what "they wanted" in 1993.

Coca–Cola argues Walsh's statement was not relevant to the discrimination alleged by Emmel. It does so by focussing on the word "past" in the midst of Walsh's statement. "[Y]ou know, as we all know, they wanted men in these positions in the past. . . ." According to Coca–Cola, Walsh was merely providing a history of the company's prior employment policies, not proffering a reason for its contemporary actions. But isolating and focussing on "in the past" in this way ignores the context of the sentence. Emmel had just found out she was passed over for promotion. She was upset. She asked her supervisor, who had been involved in the promotion decisions, why she had been passed over. He told her, "Let's close the door and speak honestly." By context what was said next would relate directly to why Emmel was not promoted. That is what they were talking about. Walsh told her "you were the only other one qualified" for the position, but added, "Karen, you know, as we all know, they wanted men in these positions in the past to run—to have D licenses and to run strike duty." Thus, the explanation Walsh offered her for why she was passed over now was that the firm had in the past wanted men in these positions. The only way such a statement is relevant in context is if it also explains why Emmel was not promoted—that the past is no different than the present;

that they wanted men in these positions in the past and still do today. That is a logical inference to draw from the statement, and, more importantly, it is the one apparently drawn by the jury given its verdict. Nor does it stand in isolation. Emmel corroborated the statement with other statements from top officers at Coca–Cola that suggest that indeed "they" believed women had no role in upper management.

Specifically, Emmel also introduced evidence of a number of statements by the top officers at Coca–Cola indicating a corporate bias against women holding upper-management positions. Duane Hallstrom, vice president of the south zone, in the presence of Thomas Noxon, vice president of company-wide sales, told Joan Fitzimons as she was being transferred out of her route manager position, that "Marvin Herb, the owner of [Coca–Cola], no longer wanted women in route management." Coca–Cola president William O'Rourke was quoted at a gathering of company management at the Brookwood Country Club "that he didn't think the beverage industry was where women were meant to be," and "that he wouldn't have his own daughters be managers of Coca–Cola Company," and that "it was a man's business." At another management meeting at McDonald's Lodge, vice president of sales Tom Noxon was quoted as stating "Let's have the women stand. We're filling our quotas nicely." [2]

These statements not only corroborate Walsh's statement that "they" wanted men in these positions, they prevent Coca–Cola from effectively arguing that Walsh's statement was merely an isolated instance of a loose tongue misstating company policy. In this regard, Coca–Cola relies on the comments by Justice O'Connor in a mixed motive case that

"stray remarks in the workplace ... cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 1804–05, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). Coca–Cola argues that if such stray remarks do not shift the burden in a mixed motive case, they surely cannot prove intentional discrimination in this case. The argument fails in at least two respects. First, Emmel does not rely on these remarks alone to prove anything. The remarks are evidence, which together with the other evidence in this case could lead a jury to conclude, by a preponderance of the evidence, that the company engaged in unlawful discrimination. Second, the quoted passage from Price Waterhouse addresses stray remarks by nondecisionmakers or by decisionmakers unrelated to the decisional process. Here, the statements in question are more than just stray comments, coincidentally corroborating Walsh's explanation of Coca–Cola's hiring priorities. They are from the top policymakers in the company, the owner, president, vice president and two regional vice presidents, who are ultimately responsible for the company's employment practices. They directly address the policy at issue, the employment of women in upper-management positions at the company. And the evidence demonstrated Walsh, Noxon, and O'Rourke were all involved in the promotions at issue here. The jury could readily conclude that the statements demonstrated a pervasive attitude that women do not belong in the upper echelons at Coca–Cola. In short, they corroborate Emmel's direct case against Coca–

**2.** Emmel testified she took Noxon's statement to mean "[t]hat the women were like a minority that were filling the quotas nicely, and that's where we're going to stay ... that they need so many women at Coca Cola." Another witness, Joan Fitzimons, also described the statement as a "discriminatory comment." In addition to suggesting the statement was never made, Coca–Cola argued the reference was to sales quotas rather than hiring or promotional quotas. Because we must view this contested evidence in the light most favorable to the verdict, *McNabola*

*v. CTA*, 10 F.3d at 515, we must view the statement as referring to the latter, which in itself constitutes sex discrimination prohibited by the Civil Rights Act of 1991. 42 U.S.C. § 2000e–2(a) (prohibiting discrimination against any individual because of such individual's sex); § 2000e–2(j) (instructing that nothing in Title VII requires quotas based on a percentage of employees within a particular group); § 2000e–2(m) (prohibiting use of race, color, religion, sex, or national origin in any employment practice, even where other factors also motivate the practice).

Cola and support the jury's verdict that Coca–Cola engaged in unlawful discrimination when it failed to promote Emmel in July 1992 and September 1993.

### D. Emmel's Indirect Case

Emmel's indirect case is built on the evidence that she was more qualified than at least some of those men promoted to the July 1992 and September 1993 ADM positions and the September 1993 key account executive positions. She had more time in a supervisory capacity at Coca–Cola than all of those promoted to these ADM and key account executive positions. She had been with the company longer than any of them. She had a positive employment history (Walsh had "always admired her work"), unlike some of those promoted. And she had a college degree, unlike some of those promoted. For example, in July of 1992, one of those promoted to ADM had 5½ year's experience with Coca–Cola, compared to Emmel's 16 years. Emmel had 8 years supervisory experience in the position of district sales manager compared with the 2½ years held by the male employee who was promoted. Emmel was named "Route Manager of the Year" in 1986 and her supervisor vice president John Walsh by his own admission "always had admiration for the work she had done for the company." In contrast, the promoted employee had received four disciplinary warnings during the preceding four years prior to his promotion. At the time of trial, over a year after he was promoted to ADM, the employee in question was unable to explain to the jury the qualification for or the skills required for the position.

Coca–Cola responded at trial by articulating a nondiscriminatory explanation for the promotions. First, it noted, promotions are not based on length of service with Coca–Cola, or on college educations, but on who would be best for the job. Beyond that, Coca–Cola offered a north zone reason and a south zone reason. According to Coca–Cola, all north zone promotions were made on recommendation of north zone vice president Walsh. According to Walsh, his criteria for promotion to ADM was recent supervisory experience and his criteria for promotion to

key account executive was ADM experience. As Emmel points out, at least one ADM promotion was directly from cold drink representative, the same non-supervisory position Emmel held, and at least one key account executive was promoted directly from district sales manager, rather than from an ADM position. Coca–Cola distinguished these promotions by classifying them as south zone promotions. According to Coca–Cola, south zone promotions were made on recommendation of south zone vice president Hallstrom and his criteria were different than Walsh's. Hallstrom apparently did not care whether the employee promoted had recent supervisory experience. He promoted only south zone personnel, personnel with whom he was personally familiar and who he believed would be best for the job.

Having articulated a non-discriminatory reason which plausibly explains why Emmel would be passed over for promotion, Coca–Cola would have us end the inquiry there. After all, Coca–Cola is not required to make the best employment or promotion decisions. In fact, its decisions may be objectively wrong-headed, so long as they are not unlawfully discriminatory. The inquiry here is whether Coca–Cola honestly believed the reason it proffered. *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1145 (7th Cir.1994). We have consistently held that the courts must avoid stepping into the role of super-personnel department and must not second-guess legitimate business decisions. Id. at 1146; *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988). And, Coca–Cola argues, Emmel was not able to directly refute the reason Coca–Cola provided—she was not able to prove pretext.

Coca–Cola's problem is two-fold. First, the jury heard evidence from which it could infer pretext. Second, just because Coca–Cola articulated a non-discriminatory reason, the jury did not have to believe it. "The defendants are off base in arguing that because the testimony of their officers ... was not contradicted directly, the jury had to accept it. The jury may have thought them liars. It is the prerogative of a jury or other trier of fact to disbelieve uncontradicted testimony unless other evidence shows that the

testimony must be true." *EEOC v. G–K–G, Inc.*, 39 F.3d 740, 746 (7th Cir.1994).[3] Not only might the jury not believe that evidence and thus the reason it attempts to support, *St. Mary's Honor Center*, 509 U.S. at 507, 113 S.Ct. at 2747, but the plaintiff may be able to prove the proffered nondiscriminatory reason pretextual and that the real reason was in fact unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.

■ Pretext does not require that the facts presented by the defendant as the reason for its employment action not be true, only that they not be the reason. When a plausible reason was in fact not the reason, it is pretextual. "Pretext . . . means a lie, specifically a phony reason for some action." *Perdomo v. Browner*, 67 F.3d 140, 144–45 (7th Cir.1995) (quoting *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995)). Coca–Cola has constructed a plausible explanation that accounts for all of the promotions. But that explanation could have been constructed post hoc—that is in preparation for trial. It may have nothing to do with the actual reason for the promotions. For instance, Coca–Cola could have intentionally discriminated against Emmel because it did not want to place women in its upper-management positions. Or, there could have been a paternalistic reason—that the job was too confrontational or unpleasant for a woman. Since neither reason would withstand scrutiny, the jury could have reasoned that the company simply came up with a justification after Emmel filed her complaint. In any event, the jury apparently found Coca–Cola's explanation was pretext. Dispositively, there is substantial evidence in the record to support such a finding, and this court may not step in and substitute its view of the contested evidence for the jury's.

The evidence provides several bases by which the jury could conclude Coca–Cola's explanation was pretextual. The memos announcing the promotions came from O'Rourke and Noxon, the president and vice president for sales, not from the respective zone vice presidents, Hallstrom and Walsh. This undercuts the argument that the promotions were made by Hallstrom and Walsh rather than by company-wide officers. And the jury may have found incredible Coca–Cola's assertion that the qualifications for its upper-management positions differed depending upon the zone in which the prospective manager presently worked. Further, evidence indicated that in the past, before the ADM position was created, key account executives had been promoted directly from district sales manager positions.

More compelling may have been Coca–Cola's failure to express this explanation earlier despite several opportunities to do so. See, e.g., *Perfetti v. First Nat. Bank of Chicago*, 950 F.2d 449, 456 (7th Cir.1991), cert. denied, 505 U.S. 1205, 112 S.Ct. 2995, 120 L.Ed.2d 871 (1992) ("If at the time of the adverse employment decision the decisionmaker gave one reason, but at the time of the trial gave a different reason which was unsupported by the documentary evidence the jury could reasonably conclude that the new reason was a pretextual after-the-fact justification."). When Emmel asked Walsh why she was not promoted, the appropriate answer, if it were true, was that she was not qualified because she did not have recent supervisory experience (or for that matter that she worked in the wrong zone). If true, this would certainly be an appropriate response. Even if not entirely true, it would have been a "better" response in that it might not have caused this lawsuit. So not only did Walsh not "truthfully" answer with this explanation at the seemingly appropriate time, he did not even fabricate it as an answer at that time. An obvious inference, apparently the one the jury drew, is that it was not the true reason at the time Coca–Cola made its decision.

This conclusion is also drawn from Coca–Cola's response to an interrogatory that, in several parts, asked the same question. Interrogatory 4(a) inquired: "Do you contend that plaintiff was denied promotions and salary increases for incompetence, unsatisfacto-

---

**3.** While we permit this inference in our review of a jury verdict, we note that the argument that a jury might not believe the proffered legitimate business reason is not enough to defeat summary judgment. *EEOC v. G–K–G, Inc.*, 39 F.3d 740, 746–47 (7th Cir.1994).

ry work performance or for any other reason?" This was followed by 4(b), which queried: "If so, please state with particularity the reason why plaintiff was separated from the service of the defendant or denied pay increases." Number 4(c) continued: "Please set forth with particularity each and every act of claimed incompetence, unsatisfactory work performance or other reason." Several more such questions followed. Coca–Cola proffered a response different from what they offered at trial (that Emmel lacked recent supervisory experience or worked in the wrong zone). Rather, Coca–Cola first provided the legalistic response that:

> Defendant objects to Interrogatory No. 4 in part because it is not applicable to this case, ... [and] ... object[s] to all inquiries regarding promotions prior to September 29, 1991 and after July 8, 1992, and salary, because they are overbroad, they are burdensome, they seek information which is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.

This was followed by the answer:

> Without waiving such objections, defendant states that because plaintiff did not seek promotion, she was not denied promotion. Thus, defendant's response to Interrogatory No. 4(a) is no. [Tr. Vol. 7 pp. 1390–91]

Although this response may have seemed clever at the time, a jury could see it as an attempt to stonewall. Not only did it refuse to answer the question, which it would later be forced to address at trial, it did so by way of questionable objections. By the time the case went to trial Coca–Cola evidently thought an answer to the question was relevant to the case. When Coca–Cola responded that because Emmel had not applied for a promotion, she had not been denied a promotion, it increased the relevance of the evidence at trial that none of the men who had been promoted to the upper level management position had applied for them either. Thus, a new discriminatory inference could be drawn: at Coca–Cola women but not men must apply for promotions. But the evidence revealed that the answer simply was not true. At Coca–Cola promotions at this level of management were never carried out in response to applications; they were carried out by the top-level management on its own initiative.

Answers to interrogatories are evidence. In this instance, they were admissions by a party opponent. Attorneys must anticipate that such an answer might find its way to the jury. And while attorneys may appreciate legalistic responses to interrogatories, juries may not. Employing this discovery tactic has risks, evident in this case. The interrogatory and Coca–Cola's response were presented to the jury, both in written form and through the testimony of one of the Coca–Cola employees responsible for providing the answers. The jury apparently concluded from the total absence earlier of the justification Coca–Cola would later offer at trial that the justification had been concocted in preparation for trial to fit the available facts. In other words that it was pretextual.

Of course, Emmel's case is not based just on indirect or circumstantial evidence, or on demonstrating that Coca–Cola's proffered reason was recently fabricated. Her case is a mix of both circumstantial evidence, evidence of pretext, and direct evidence of discrimination. See, e.g. *Troupe v. May Dept. Stores, Co.*, 20 F.3d 734, 736 (7th Cir.1994) (evidence of one type may support a verdict on its own or be combined with evidence of another type). The strongest evidence that Coca–Cola's proffered reason for its upper-management promotions was pretextual was the same evidence at the heart of Emmel's direct evidence case—the contemporaneous explanation by Walsh that she had not been promoted because "they wanted men in these positions." That admission, combined with the evidence that "they" in fact did not want women in upper-management positions—evidence derived from statements made by the owner, the president and CEO, and the vice president for sales—reasonably lead to a conclusion that Coca–Cola's explanation was pretextual.

 Two plausible but conflicting explanations exist for what happened in this case. Substantial evidence, in the form of testimony and exhibits, supports each position. As

fact finder, the jury found Emmel's more likely than not the accurate explanation for what occurred. A motion for judgment as a matter of law should be granted only when there can be but one conclusion from the evidence. *McNabola*, 10 F.3d at 515. Because substantial evidence exists supporting the jury's determination, we cannot disturb the verdict. *Giacoletto v. Amax Zinc Co., Inc.*, 954 F.2d 424, 427 (7th Cir.1992). Accordingly, we affirm the district court's denial of Coca–Cola's Rule 50(b) motion for judgment as a matter of law.

## II. Motion for a New Trial

■ Coca–Cola also attacks the verdict with a brief, undeveloped argument that, absent outright reversal of the verdict, we should reverse the district court's denial of its motion for a new trial. Our review of the district court's denial of a motion for a new trial is for clear abuse of discretion. *McNabola*, 10 F.3d at 516. We look to whether "the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." Id., quoting *Tapia*, 965 F.2d at 338. Coca–Cola does not allege that the trial was not fair; it argues the district court abused its discretion because the evidence did not support the verdict. (It also argues the damages were excessive, but we get to that later.) Coca–Cola provides us no factual or legal arguments that would affect this determination. It merely argues there was "no evidence whatsoever" of pretext. Unfortunately for Coca–Cola, sufficient facts were admitted into evidence to support the jury verdict. Having determined that the evidence supported the verdict, we would be hard pressed to also determine that the district court abused its discretion by arriving at the same conclusion. We have considered Coca–Cola's other brief arguments that the district court abused its discretion in denying Coca–Cola a new trial and found them equally without merit. Accordingly we affirm the district court's denial of Coca–Cola's motion for a new trial.

## III. Punitive Damages

The jury awarded Emmel $43,000 in back pay and $7,325 in compensatory damages.

In addition, pursuant to a jury instruction permitting punitive damages on a special finding that Coca–Cola "engaged in intentional discrimination or retaliation with malice or reckless indifference to the rights of plaintiff Karen Emmel," the jury awarded Emmel $500,000 in punitive damages. The district court subsequently reduced the combined compensatory and punitive damage award to $300,000 as required by 42 U.S.C. § 1981a, resulting in a final punitive damage award of $292,675. Coca–Cola asserted that the jury erroneously returned a punitive damage award of $500,000, even though there was no evidence of malice or reckless indifference to Emmel's federally protected rights. We review the district court's denial of that motion for clear abuse of discretion. *McNabola*, 10 F.3d at 516.

■ Title VII provides for punitive damages in employment discrimination cases. The prevailing party is not automatically entitled to such damages. To prevail only requires that the plaintiff have proven that intentional unlawful discrimination was more likely than not the reason underlying the adverse employment decision in question. See, e.g., *Hybert v. Hearst Corp.*, 900 F.2d at 1054. Punitive damages require more. In order to secure punitive damages, the plaintiff employee must prove that the defendant employer engaged in the discriminatory practice "with malice or with reckless indifference to the federally protected rights" of the employee. 42 U.S.C. § 1981a(b)(1) ("Determination of punitive damages"). This is a higher hurdle than merely proving the underlying unlawful discrimination. And having gotten over this additional element of proof, the amount of punitive damages to which a plaintiff is entitled is determined by the degree of egregiousness of the underlying "malice or reckless indifference." See *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1355–56 (7th Cir.1995) (discussing relationship between degrees of egregious conduct and punitive damages).

■ In this case, the district court found that the evidence at trial "established that Coca–Cola had a policy of discrimination against women in upper-management posi-

tions enunciated by the owner of defendant company, Marvin Herb, or at the very least, had reckless indifference to the federally protected rights of the women qualified for such positions to be free from sex discrimination." *Emmel v. Coca–Cola Bottling Co. of Chicago,* 904 F.Supp. 723, 728 (N.D.Ill.1995). This case was not a simple indirect evidence or statistical case of discrimination. The evidence introduced by Emmel at trial included a number of statements by the owner, the president, the vice president, and the vice president for the northern zone, which indicate a clear corporate resistance to women holding positions in upper management at Coca–Cola. Not only were the statements indicating this attitude made, and made with no apparent hesitation in front of other management personnel, but Walsh's statement, along with the evidence concerning promotions at Coca–Cola, indicate Coca–Cola also acted on that policy. In short, the district court did not abuse its discretion in denying defendant a new trial on punitive damages because ample evidence supports the jury's verdict that the defendant acted, if not with malice, with reckless indifference to Emmel's rights. 42 U.S.C. § 1981a(b)(1).

■ Coca–Cola argues the punitive damage award must be reduced further, relying principally on our decision in *Hennessy,* 69 F.3d 1344. In Hennessy, we held that when Congress amended Title VII to permit awards of compensatory and punitive damages, "it was concerned with keeping these damages under control." Id. at 1355. In doing so, it fashioned a sliding limit on total combined compensatory and punitive awards. The limit increased with the size of the company. The maximum combined award against a company the size of Coca–Cola is $300,000, which is the highest award permitted by the statute for the largest category of companies. Thus, the district court lowered the jury's award to that amount. In *Hennessy,* we reversed an award at the top end of the range because the evidence, although it was sufficient to support punitive damages, did not support the conclusion that the conduct was particularly egregious in the hierarchy of possible civil rights violations. We expressed an interest in reserving the maximum available punitive damages for the most

egregious cases, such as "the legion of quid pro quo" sexual harassment cases. See id. at 1355–56. Hennessy involved "a smidgin" of sexual harassment, id. at 1352–53, some evidence that the president of the defendant company did not want women in certain positions "because they get pregnant," id. at 1354, and a single case of a discriminatory termination attributed to a single supervisor. We determined that although the facts supported the jury's assessment of punitive damages, they did not support the maximum punitive damages.

By contrast, viewing the evidence favoring the verdict for Emmel, the situation at Coca–Cola was considerably more egregious. At Coca–Cola, company policy, as articulated by the owner and the top corporate officers, was that women did not belong in upper management. Walsh explicitly stated this to Emmel, telling her behind closed doors that despite the fact that she was the only other one qualified, "they wanted men in these position." The "they" about whom Walsh spoke confirmed Coca–Cola's reckless indifference to Emmel's individually held right to be free from unlawful discrimination. The owner told his top officers that he did not want women in route management. The firm's president and CEO declared that women did not belong in the beverage industry. He expressed that he would not even have his own daughters in Coca–Cola management, and pronounced that "it was a man's business." The vice president of Coca–Cola had the women stand at a company meeting and explained that Coca–Cola was "filling our quotas nicely," conveying the message, as Emmel described it, that rather than promoting women on their individual merit, Coca–Cola maintained an unlawful quota system wherein they cared only if they had the correct percentage of women employees as a group. Evidence before the jury indicated that Coca–Cola came up with the "recent supervisory experience" justification as a pretext for its failure to accord Emmel an equal opportunity for promotion despite significantly more supervisory experience with Coca–Cola than the men who were promoted. The failure to promote Emmel was not an isolated instance of discrimination by a single

638

supervisor, but the predictable outcome of not-so-secret company practice. The evidence indicated that Emmel was not promoted as a direct result of that practice. In light of the significant evidence that Coca-Cola maintained a policy of intentional disregard for the statutory rights of its female employees, we cannot say the maximum punitive damage award was inappropriate in this case.

For the foregoing reasons, the decision is AFFIRMED.