In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-1981

JAMES CAMPBELL,

*Plaintiff-Appellant,*

*v.*

FRANK MILLER, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 03-CV-180—**Sarah Evans Barker**, *Judge.*

ARGUED JANUARY 8, 2007—DECIDED AUGUST 28, 2007

Before EASTERBROOK, *Chief Judge,* and ROVNER and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* James Campbell was arrested in the front yard of his friend's house by Officer Frank Miller, an Indianapolis police officer who suspected that Campbell possessed marijuana. Miller and another officer each conducted an initial patdown search, which did not reveal any sign of weapons or contraband on Campbell. They decided, however, pursuant to an Indianapolis policy that instructs officers to conduct "immediate and thorough body search[es]" of those under arrest, to take Campbell into the open backyard of his friend's house and subject him to a strip search involving a visual inspection of Campbell's anal cavity. The backyard area

was in plain sight of those inside both Campbell's friend's house and some of the neighbors' houses; indeed, Campbell's friend watched the search take place from his kitchen window. After the search, Campbell was issued a citation and released.

Campbell sued Officer Miller, other Indianapolis police officers involved in the arrest, and the City of Indianapolis ("the City") under 42 U.S.C. § 1983, claiming that the search and the City's policy that authorized it were unconstitutional under the Fourth Amendment. (He also raised various state law claims not relevant to this appeal.) The case was tried by a jury, which found for the defendants. Campbell appeals, arguing that no reasonable jury could have concluded that this was a reasonable search. He also challenges the instructions to the jury, as well as the district court's decision to exclude the testimony of three of his potential witnesses. We agree with Campbell in part. While there was evidence to support the jury's conclusion that Officer Miller had reasonable suspicion to conduct the search, we conclude that no reasonable jury could find that a strip search conducted *in public* for no identifiable reason conformed with the Fourth Amendment. We therefore reverse the judgment in favor of Officer Miller and remand for entry of judgment in Campbell's favor on his Rule 50(b) motion. This will necessitate further proceedings on the appropriate remedy. We affirm the judgment for the City, because what was objectionable about the search—that is, its public nature—was not caused by the City's policy or practice, and there was nothing in the court's evidentiary rulings that require us to set aside that part of the verdict.

# I

On June 14, 2002, shortly before 8:00 p.m., Officer Kevin Duley, a detective with the Indianapolis Police Depart-

ment, was patrolling in his police car in the area of 34th Street and Drexel Avenue in Indianapolis. Duley turned onto Drexel Avenue, where he noticed three people standing in the middle of the street. Duley recognized one of them as a man named Antonio, with whom Duley had dealt in numerous prior drug investigations. As Duley drove closer to the threesome, he saw what he believed to be a hand-to-hand drug transaction. Duley continued driving toward them, at which point they scattered. One of the three people looked directly at Duley and then ran. Duley then broadcast a description on his police radio of the man who fled. Because he did not get a good look at the man's face, Duley described the suspect only as a black male with a dark, multi-colored, striped sweater who "might have braids." He said that the man was in the area of 34th and Drexel.

Roughly two blocks away, Officer Miller, who had heard the radio call and description, saw Campbell walking up a driveway at 3415 Colorado Avenue. Campbell later testified that he was visiting his friend, Kimo Parham, at that address. According to Miller, Campbell—a black male—was wearing dark pants and a multi-colored sweater and thus fit the description that Duley had broadcast. As Miller approached that house in his police car, Campbell continued walking up the driveway. Believing that Campbell was the suspect who had just run away from Officer Duley, Miller stopped his car, got out, told Campbell to stop and motioned to him to come over. Campbell did not stop right away; instead, he said something to the effect of, "No, you have me messed up," and began to back away from Miller. Campbell testified that he was shocked that he was being stopped, and that he wanted to get as close to his friend's house as possible so that someone inside might hear Officer Miller and come out to observe what was going on. In any event, Miller told Campbell to stop a second time, but Campbell

continued moving toward the house. Miller then drew his gun and told Campbell to get on the ground. He testified that he did so because Campbell "was not complying with two verbal commands," and Miller was concerned that Campbell might have been armed. As Campbell continued to back away from Miller, Miller claimed that he saw Campbell drop something. Miller kept his gun trained on Campbell until another officer arrived on the scene, at which point Campbell stopped moving away and leaned against a car in the driveway where Miller handcuffed him.

Miller then reported over the radio that he had detained someone who met Duley's earlier description. Miller also informed another officer on the scene that Campbell had dropped something on the ground. Shortly thereafter, the other officer found a bag of marijuana in the spot where Miller told him to look, and he brought it over to Miller. Around the same time, Duley, who had arrived at 3415 Colorado by then, spoke with Miller. He told Miller that he put out the radio broadcast because he believed that he had witnessed a drug transaction. Miller then showed Duley the marijuana that was recovered, and Duley attempted to identify Campbell as the man he had seen earlier. Although Duley believed that Campbell's height, weight, complexion and clothing "matched perfectly," he was unable conclusively to identify Campbell since he had never gotten a good look at the suspect's face and hair. Campbell disputes this point. He testified at trial that Duley definitively stated to Miller that Campbell was *not* the man Duley had seen engage in the earlier suspected drug deal. Taking the facts in the light most favorable to the jury's verdict, however, as we must at this stage, we credit Officer Duley's version of events.

After handcuffing Campbell, Miller performed a patdown search. Miller patted down Campbell's back, arms, torso, and thighs, but he did not find a weapon or any illegal

substances. Officer Andrew Lamle, who had arrived by that time, also conducted his own patdown search and similarly found no weapons or contraband. Miller then searched through Campbell's pockets, turning up only a key chain and some Chapstick.

But the officers were not satisfied, and the searching was not over. Officers Lamle and Miller then escorted Campbell to Parham's backyard. Parham's house is situated in such a way that his house and three other houses essentially surround the backyard. Parham's backyard, which Parham describes as "open," thus may be viewed by people in one of the other three homes, in addition to anyone standing in Parham's house. Parham himself had a "clear view" from his kitchen window of his backyard and in fact watched the search that took place. Once in the backyard, Miller undid Campbell's belt buckle, pulled his pants partway down, and had him lean forward. Miller then separated Campbell's buttocks and did a "visual inspection" so as to "make sure he had nothing shoved into his anal area. . . ." Finding nothing, Miller had Campbell sign a summons to return to court and released him. Instead of taking Campbell to the station to be booked, the police issued him a summons, because of an order that had gone into effect on April 19, 2002, from the Executive Committee of the Marion County Superior Court ("the Superior Court Order"). That order, issued in an effort to address prisoner overcrowding at the Marion County Lock-up facility, advised law enforcement officials to issue summonses in lieu of arrest for individuals arrested for certain non-violent misdemeanors including possession of marijuana.

Miller testified that he conducted the search pursuant to the Indianapolis Police Department General Order 18.02. That order states, in relevant part, "Any officer making an arrest or otherwise coming into control of a prisoner must make an immediate and thorough body

search of the prisoner, including footwear, and all property under the prisoner's control (bags, purses, backpacks, etc.)." The order does not distinguish between arrests where an arrestee is taken into custody and those where the arrestee is issued a citation and released.

In the end, Campbell was never prosecuted for anything. He brought this suit under 42 U.S.C. § 1983 against a number of Indianapolis police officers, including Officer Miller, claiming that the backyard search violated the Fourth Amendment. Specifically, Campbell contended that the police lacked reasonable suspicion to conduct such an invasive search in a public area. He also sued the City, claiming that the search was done pursuant to the City's policy and that there was a practice and custom of performing such searches without the requisite justification. At the close of Campbell's case-in-chief, the district judge granted judgments as a matter of law in favor of certain defendants, leaving only the claims against Officer Miller and the City for the jury. Before the case was submitted to the jury, Campbell moved under FED. R. CIV. P. 50(a) for judgment as a matter of law; the court denied that motion. The jury returned a verdict in favor of Miller and the City. It concluded that Officer Miller had "a reasonable suspicion that drugs or other contraband would be revealed by his search" and that the scope and manner of the search was reasonable in light of Miller's reasonable suspicions. Campbell renewed his motion for judgment as a matter of law under Rule 50(b), arguing again that the police did not have the requisite justification for the search and that the manner in which it was conducted was unreasonable. The motion was denied.

## II

Campbell argues on appeal that no reasonable jury could have found the search undertaken in Parham's backyard

to have been reasonable. He also asserts that General Order 18.02, under which the defendants concede the search was conducted, establishes an unconstitutional policy, and that he is therefore also entitled to judgment as a matter of law against the City. Campbell's first point relates to the justification for searching him at all: he contends that, because the search was non-custodial, "a heightened level of justification was required before a more intrusive search [than a simple patdown search] could be performed," and the police lacked such justification. Secondly, he contests the manner of the search, specifically the fact that it was conducted in public.

We review *de novo* a trial court's grant or denial of judgment as a matter of law under Rule 50. *Mathur v. Bd. of Trs. of Southern Illinois University*, 207 F.3d 938, 941 (7th Cir. 2000) (citing *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 629 (7th Cir. 1996)). Our inquiry is limited to the question "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Id.* (quoting *Emmel*, 95 F.3d at 629-30).

## A

We evaluate the constitutionality of a given search by "balancing . . . the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). In doing so, we consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.*" Id.* As we have previously observed, "The more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the

search will uncover the objects for which the search is being conducted." *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983) (citing *Terry v. Ohio*, 392 U.S. 1, 18 n.15 (1968)).

The first question we must resolve in Campbell's appeal is whether the police were justified in conducting a body cavity search at all. The parties agree that the search here was incident to Campbell's arrest for possession of marijuana. In *United States v. Robinson*, 414 U.S. 218 (1973), the Supreme Court reaffirmed the broad scope of authority the police possess to conduct searches incident to arrest. *Robinson* recognized two distinct historical rationales for allowing such searches: "(1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial." *Knowles v. Iowa*, 525 U.S. 113, 116 (1997) (citing *Robinson*, 414 U.S. at 234). The Court stated in *Robinson*:

> A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant

requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.

414 U.S. at 235. Accordingly, the Court condoned "a relatively extensive exploration of the person," *id.* at 227 (quoting *Terry*, 392 U.S. at 25), but stated that it would find unconstitutional a search that was "extreme or patently abusive." *Id.* at 236.

Campbell argues that *Robinson* does not apply at all to his case, because it speaks only of custodial searches, and (in keeping with the Superior Court Order) he was not taken into custody. He points out that *Robinson* explicitly recognized that "the danger to an officer is far greater in the case of the extended exposure which follows the taking of a suspect into custody and transporting him to the police station than in the case of the relatively fleeting contact resulting from the typical *Terry*-type stop." *Id.* at 235-36. Campbell urges us to look for guidance instead to *Knowles*, a case where the Supreme Court refused to extend *Robinson'*s "bright-line rule" pertaining to searches incident to arrest to the searches "incident to citation." *Knowles*, 525 U.S. at 119 (1998). In *Knowles*, an Iowa police officer stopped Knowles for speeding and issued him a citation, even though under the law in Iowa at the time, Knowles could have been arrested. The officer then conducted a full search of Knowles's car, where he found a bag of marijuana and a pipe. *Id.* at 114. The Court held that the search violated the Fourth Amendment. In the process, it distinguished *Robinson* on the ground that the concern for officer safety is diminished in the context of a routine traffic stop as compared to that of a custodial arrest. Campbell is thus correct that, in applying the *Wolfish* balancing analysis, the fact that his arrest was non-custodial tends to support a higher threshold for reasonableness. See *Salinas v. Breier*, 695 F.2d 1073, 1083 (7th Cir. 1982) ("[I]t is well established that

there is considerably greater constitutional power in the police to search the bodies of persons in custody than the bodies of persons not in custody.").

*Knowles*, however, is not as helpful to Campbell as he thinks, because officer safety is only one of the two underlying justifications for the full searches incident to arrest sanctioned by *Robinson*. As noted in *Robinson*, "The justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial." 414 U.S. at 234. We agree with Campbell that the police needed to have a reasonable suspicion that Campbell was concealing contraband in order to justify the search under the second rationale articulated in *Robinson*. See *Mary Beth G.*, 723 F.2d at 1273; *Swain v. Spinney*, 117 F.3d 1, 7 (1st Cir. 1997) ("[C]ourts have concluded that, to be reasonable under *Wolfish*, strip and visual body cavity searches must be justified by at least a reasonable suspicion that the arrestee is concealing contraband or weapons."). The problem for Campbell is that the jury concluded the police had such suspicion. Thus, in considering whether the police were justified in conducting a strip search at all, the question before us is simply whether there is evidence in the record that could lead any rational jury to that conclusion. Although it is a close call, we believe that there was such evidence.

To begin with, Campbell is not like the arrestee in *Knowles*, who was stopped for speeding and for whom the police already had all the evidence they needed for a prosecution. See *Knowles*, 525 U.S. at 118. Campbell, in contrast, was arrested for narcotics possession, which is "the kind [ ] of crime . . . that might give rise to a reasonable belief that [an arrestee] was concealing an item in a body cavity." *Mary Beth G.*, 723 F.2d at 1273; see also

*Salinas*, 695 F.2d at 1083 (7th Cir. 1982). While that alone may not be enough to justify a strip search, in this case there was more. When Miller first encountered Campbell, he reasonably believed that Campbell fit the description of a man who just recently had engaged in a drug transaction and then fled from another officer. Miller testified that he saw Campbell drop a bag of marijuana and then disregard Miller's repeated commands to stop moving away. Given the nature of the offense, the fact that Campbell had already discarded suspected contraband, and the fact that he subsequently acted evasively, it was fair for Miller to infer that Campbell was still hiding something. Under those circumstances, we cannot find the jury's verdict regarding Miller's reasonable suspicion to be wholly irrational.

B

The question whether an otherwise permissible search is conducted in a reasonable manner is a different one. Under *Wolfish*, we must consider the manner of the search, including "the place in which it [was] conducted." *Wolfish*, 441 U.S. at 559. To pose an extreme example, if the Chicago police were to arrest a suspected drug dealer and then conduct a strip and body cavity search in Chicago's heavily used Millennium Park, there would need to be a very good reason for choosing that manner of proceeding. The question here is thus whether the search performed on Campbell, involving as it did public nudity and exposure of intimate body parts, was reasonable. In our view, it was not, and no reasonable jury could have found otherwise. We have previously recognized that strip searches involving the visual inspection of the anal area are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, [and] signify[] degradation and submission . . . ." *Mary Beth G.*, 723 F.2d

at 1272. The invasion of privacy rights at issue here is at its highest, no matter where the search was conducted. Having decided, legitimately, to conduct this type of search, the police inexplicably did not even afford Campbell the dignity of doing it in a private place. (For example, they could have taken him briefly to the lock-up facility. Even if they had not wanted to keep him there, because of overcrowding concerns, there is nothing in the record to indicate that they could not have used it for this limited purpose.)

The Supreme Court noted in *Illinois v. Lafayette*, 462 U.S. 640, 645 (1983), in the course of discussing inventory searches incident to booking and jailing:

> Police conduct that would be impractical or unreasonable—or embarrassingly intrusive—on the street can more readily—and privately—be performed at the station. For example, the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street, but the practical necessities of routine jail administration may even justify taking a prisoner's clothes before confining him, although that step would be rare.

Courts across the country are uniform in their condemnation of intrusive searches performed in public. See, *e.g.*, *Iskander v. Village of Forest Park*, 690 F.2d 126, 129 (7th Cir. 1982) ("Defendant naturally does not maintain that routine strip searches may be conducted in a room open to the prying eyes of passing strangers consistent with the reasonableness requirement imposed on all searches under the Fourth Amendment, nor would such a contention be entertained."); *Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981) ("We think that, as a matter of law, no police officer in this day and time could reasonably believe that conducting a strip search in an area exposed to the general view of persons known to be in the vicinity whether or not

any actually viewed the search is a constitutionally valid governmental invasion of (the) personal rights that (such a) search entails." (internal quotations omitted)); *Amaechi v. West*, 237 F.3d 356, 364 (4th Cir. 2001) (noting that "we have repeatedly emphasized the necessity of conducting a strip search in private" and concluding that "[t]he fact that, absent clear justification or exigent circumstances, an officer is not allowed to strip an arrestee on a public street pursuant to a search incident to an arrest necessarily means that an officer cannot go even further than simply disrobing the arrestee by actually touching and penetrating the arrestee's exposed genitalia on the public street."); *Hill v. Bogans*, 735 F.2d 391, 394 (10th Cir. 1984) (finding unconstitutional "routine strip searches in a public area of persons detained for minor traffic offenses."); *United States v. Ford*, 232 F. Supp. 2d 625, 630 (E.D. Va. 2002) (granting a motion to suppress, stating that "[t]aking the *Bell* factors into account, the Court concludes that the police officer engaged in a highly invasive search by exposing the defendant's buttocks on the side of a public highway in broad daylight, and that the search violated the defendant's Fourth Amendment protection"); *People v. Mitchell*, 768 N.Y.S.2d 204, 206-07 (1st Dep't 2003) ("[W]e have no difficulty in holding that a strip search, conducted in a *public place*, regardless of whether it includes a search of the arrested person's body cavities, is not justified or reasonable absent the most compelling circumstances, that is, circumstances that pose potentially serious risks to the arresting officer or others in the vicinity . . . ." (emphasis in original)).

There is no dispute in this record that the search was conducted in an area where Campbell's friend was able to watch and where others could have done so as well. Moreover, there was nothing before the jury that suggested any conceivable exigency that could be met only by strip-searching Campbell in public, on the spot. In our

view, those factors conclusively tip the balance under *Wolfish* in Campbell's favor. We conclude, on the basis of this record, that the district court should have granted Campbell's motion under Rule 50(b) for judgment as a matter of law against Officer Miller, and that this part of the case must be remanded for further proceedings on damages.

## III

Campbell's claim against the City, however, is different. He offers two reasons why we should overturn the jury's verdict in the City's favor: first, that the City had a policy that offended the Constitution, and second, that the district court erred by excluding certain witnesses who would have supported this claim. We reject both of these arguments.

There is no evidence in the record that it was the City's policy that arrestees had to be searched *in public*, and that is the only aspect of this particular search that violates the Constitution. It is well-established that "a municipality can be liable under § 1983 only where its policies are the moving force [behind] the constitutional violation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) (citing *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978)). A municipality cannot be held liable on a *respondeat superior* theory. *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001). In order to prevail, Campbell needed to show that the search was conducted in public because of "(1) the enforcement of an express policy of the City, (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Id.* See *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). There is nothing in this record indicating that the decision to strip-

search Campbell in public was influenced in any way by the City's policy or practice. That decision appears to have been made by Officers Miller and Lamle alone, which precludes finding the City liable under § 1983.

If the district court had committed prejudicial error in its decision to exclude some of the witnesses Campbell wanted to use to prove his claim against the City, that too would be a reason for reversal on this part of the case. Campbell objects to the exclusion of three of his witnesses, two of whom—Officers Julian Wilkerson and Andre Bell—fall in that category. We thus consider only his contentions related to those two, as our conclusion that his Rule 50(b) motion should have been granted against Miller moots any possible error with respect to the third witness. We review the district court's decision to exclude this testimony for abuse of discretion. See *United States v. Evans*, 486 F.3d 315, 325 (7th Cir. 2007).

The district judge concluded that Officer Wilkerson had nothing relevant to contribute to any of Campbell's theories of liability, including his policy and practice claim against the City. Campbell argues on appeal that Wilkerson would have shown that there was a practice and custom on the street to perform searches more invasive than the City's policy permitted. In fact, Wilkerson's proffered testimony showed no such thing. Wilkerson testified primarily regarding one particular arrest he made in November of 2002. Contrary to Campbell's characterizations, Wilkerson in fact did not conduct a strip search at all in that arrest; instead, the arrestee's loose-fitting pants—but not his boxers—came down around his thighs during the physical struggle leading to the arrest. When asked by plaintiff's counsel why Wilkerson did not conduct a more thorough search, Wilkerson stated, "Because I don't carry gloves, and I don't do that out on the street." On cross-examination, Wilkerson was asked, "You didn't have him strip to his bare body?" Wilkerson

replied, "No. As I said, it was broad daylight. We were in somebody's driveway at the time, and I had my sergeant and a couple of other units there. There's no reason to." Finally, Wilkerson was asked, "Are you taught or is it a custom or practice of the department to conduct strip searches [or body cavity searches] in public?" He answered, "No."

With regard to Officer Bell, there was no specific offer of proof in the district court or any real discussion on appeal about what he would have said. Nothing in the record suggests that Bell would have confirmed any practice or custom of conducting strip searches in public. The district court was thus correct to conclude that neither Wilkerson nor Bell had anything to offer in support of Campbell's claim against the City.

**\*    \*    \***

We AFFIRM the judgment in favor of the City, REVERSE the judgment in favor of Officer Miller and REMAND for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*