In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1459

KENNETH H. GOODWIN, JR.
and JACQUELINE GOODWIN,

Plaintiffs-Appellees,

v.

MTD PRODUCTS, INCORPORATED,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Wisconsin
No. 99 C 220--John C. Shabaz, Chief Judge.

Argued September 12, 2000--Decided November
14, 2000

Before POSNER, COFFEY, and MANION, Circuit
Judges.

COFFEY, Circuit Judge.  On June 6, 1998,
Kenneth Goodwin suffered an injury to his
left eye after being struck by a plastic
wing nut discharged from the lawn mower
he was using. Based on his injuries,
Goodwin filed a product liability suit
against MTD Products (the manufacturer of
the lawnmower), claiming that: 1) MTD
negligently manufactured the mower; 2)
the mower left MTD's "possession and
control" in a defective condition; 3) the
mower was unreasonably dangerous; and 4)
MTD breached expressed and implied
warranties relating to the mower. After
trial, the jury awarded Goodwin
$603,167.96 plus costs, and the judge
denied MTD's motions for judgment as a
matter of law and for a new trial. We
affirm.

I.  BACKGROUND
  In late April 1998, Goodwin purchased an
MTD lawn mower from Wal-Mart and
transported it to his home. According to
Goodwin's testimony, he

took it out of the truck and laid it by

the front, by the front porch and [he] opened the box and took the lawn mower out and the directions and [he] just kind of flipped through the directions and glanced at a few things and . . . then he flipped the handle up and tightened the wing nuts on the handle and put some oil and some gasoline in it and started mowing [his] lawn.

After having used the mower on three or four prior occasions, Goodwin took the mower from his garage on June 6, 1998, at approximately 10:00 in the morning. After mowing for about 20 minutes, and while walking directly behind the mower and approximately five feet from his house, Goodwin "felt something hit [him] in the [left] eye and [he] just let go of the lawn mower and [ ] put [his] hand up to [his] face and . . . [he] could tell that [he] was bleeding."/1 Goodwin's wife immediately drove him to the emergency room at Vernon County Hospital in Vernon, Wisconsin, and he was transferred to Gunderson Lutheran Hospital in La Crosse, Wisconsin, the next day for eye surgery.

A few days after his surgery, Goodwin, while searching his yard in an attempt to discover what possibly could have hit him in the eye, discovered a plastic wing nut in approximately the same area of the yard where his injury occurred. Subsequently, Goodwin filed suit alleging that the lawn mower was dangerous and defective in that the plastic wing nut became loose and fell into the mower's blade due to the vibrations caused by the lawn mower's motor. According to Goodwin's theory, the wing nut was then propelled out the side chute (facing down) at a high rate of speed (approximately 190 miles per hour), hit the ground, bounced off the ground, hit the house approximately five feet away, and ricocheted into his left eye. On the other hand, MTD claimed that the lawn mower was properly designed and safe, and that it would have been impossible for the plaintiffs' "ricochet" theory to have occurred.

However, Goodwin gave the only eye-witness testimony regarding the accident and subsequent injury to his left eye. Furthermore, Goodwin introduced the deposition of the doctor who performed his eye surgery as well as expert testimony as to the manufacture, design,

and condition of the lawn mower. MTD attempted to counter Goodwin's theory with expert testimony of its own concerning the manufacture, design, and operation of the MTD lawn mower.

A.  The Plaintiffs' Experts

  1.  Dr. Christopher Born

  As the trial judge informed the jury, "Dr. Christopher Born is a medical doctor certified in ophthalmology, having practiced for 20 years at the Gunderson Lutheran Medical Center in La Crosse, Wisconsin. He specialized in eye surgery with a subspeciality in the cornea and the front part of the eye."

  According to Dr. Born's deposition testimony introduced at trial:

I saw Kenneth Goodwin on the 7th of June, 1998 in the emergency room at Gunderson Lutheran Hospital with an injury to his left eye. He had a laceration on the left lower lid. He had a very unusual laceration to the left cornea.

  The cornea is the front window of the eye and most lacerations of the cornea caused by flying objects are more a direct penetration to the cornea. This one [Goodwin's eye injury] started at one side of the cornea and sliced and shelved completely across the cornea ending up just before it entered the eye. The reason that type of injury is unusual is because normal objects are either sharp enough to penetrate directly into the eye or large enough that they cause a concussive injury to the eye. This one [the injury to Goodwin's eye] was obviously caused by an object that was large enough to carry significant momentum and yet wasn't particularly sharp.

  It is my opinion that the broken wing nut [in this case] is a type of projectile consistent with the injury to Mr. Goodwin's cornea. It satisfies that criteria, being large enough to cause a significant blow to the eye and relatively sharp being cut by the lawn mower to cause the slice and injury to the eye.

  After plaintiffs' attorney finished with the narrative reading of Dr. Born's

deposition testimony, the defendantelected not to offer a responsive narrative nor did MTD offer any expert medical opinion of its own. Thereafter, the plaintiffs called their engineering expert, Donald Marty.

2.  Donald Marty

As the district court informed the jury,/2

Donald Marty is a licensed professional engineer with a bachelor's degree in mechanical engineering and a master's degree in mechanical engineering from the University of Wisconsin-Madison.

He has been employed by Safety Engineering Associates in Madison since 1988 and holds various memberships and certifications. He has lectured and attended many continuing education courses.

Before reaching any opinion, Marty: 1) inspected the "subject rope guide and wing nut from the accident lawn mower"; 2) compared the rope guide and wing nut design used by MTD with other lawn mower designs; 3) reviewed the operator's manual; 4) reviewed the safety standards published by the American National Standards Institute (ANSI) for lawn mowers; 5) reviewed the sales literature from MTD and Wal-Mart; and 6) reviewed the depositions of the Goodwin's, Dr. Born, and MTD's expert, Gunter Plamper. Based on his review of the evidence and testing he performed to determine the residual torque of different types of wing nuts as fastening devices for different rope guides, Marty concluded that MTD's use of a plastic wing nut in the assembly of the lawn mower's rope guide was unreasonably dangerous.

Question: Do you have an opinion to a reasonable degree of engineering certainty as to whether or not the lawn mower, specifically the plastic wing nut in question, was defective and unreasonably dangerous as sent by the manufacturer [MTD] and purchased by the consumer [Goodwin]?

Answer: Yes. In my opinion it is defective and unreasonably dangerous.

Questions: Why is that?

Answer: Because the plastic wing nut does not have a locking feature and it can easily unthread if it should loosen.

Question: Is it feasible using the exact design of this mower to use a lock nut with a plastic or nylon insert?

Answer: Yes it is. . . . That would be the lock nut and rope guide that I talked about earlier from the Weed Eater lawn mower. That design has two features. One, it has a shoulder formed onto the rope guide so it can be tightly clamped to the handle.

In addition it has the steel lock nut with a nylon insert which one can tightly clamp the rope guide to the handle of the lawn mower and also it has the locking feature that we've been talking about. If the nut should be loose for whatever reason, it will not unthread as long as the nylon locking feature is engaging the threads. In my opinion that's a much safer design.

Additionally, Marty testified that the plastic wing nut turned "very, very easily" and demonstrated this by turning the plastic wing nut with his finger.

On cross-examination, Marty made it clear that his testimony was focused toward the defective nature of the plastic wing nut used on the MTD lawn mower and stated, "I have not reviewed or analyzed other parts of the lawn mower. They may or may not be defective, but I do not have opinions." Furthermore, Marty admitted that the lawn mower complied with ANSI standards. Additionally, Marty consistently maintained, throughout both direct and cross-examination, that the use of a plastic wing nut was "defective and unreasonably dangerous" because "the plastic wing nut does not have a locking feature and it can easily unthread if it should loosen" due to the vibrations of the mower's motor, and that lawn mowers should be equipped with steel lock nuts with nylon threads because it is "a much safer design."

B. The Defendant's Expert Gunter Plamper

After MTD's motion for a directed

verdict was denied, the defense called Gunter Plamper, an engineer, as its rebuttal expert. Plamper is a registered professional engineer in Germany and worked as an engineer in Nuremberg, Germany, for Siemans Company before coming to the United States in 1964. Plamper was initially hired by MTD in 1964 as a project engineer and given the task of designing a high-end self-propelled walk-behind lawn mower. In 1970, he was promoted to chief engineer of consumer products, and remained in that position until 1994. Currently, he is MTD's vice president in charge of product development and safety. Furthermore, Plamper holds eight patents which have been incorporated into mass-produced products. Additionally, he is involved with ANSI and is a member of the Engineering Subcommittee for the Outdoor Power Equipment Institute as well as a number of other safety organizations.

As one would expect, Plamper had a much different opinion as to the safety of the MTD lawn mower in question.

Question: Mr. Plamper, in your opinion based on a reasonable degree of engineering certainty is this model mower safe to use?

Answer: Yes.

Question: How so?

Answer: It meets all the requirement[s]. The warnings make the operator aware of the danger of a thrown object. I mean he would behave accordingly [sic] to the warning and the instructions this accident would not have occurred.

Question: Can the mower be operated safely without an injury to the operator?

Answer: Yes. There are millions of them used every day and very safe [sic].

Question: Do you have an opinion, Mr. Plamper, based on a reasonable degree of engineering certainty as to the condition of the machine at the time of design and manufacture when it left MTD?

Answer: Yes.

Question: And what is your opinion?

Answer: My opinion is when this machine left MTD it met all the requirements and was perfectly safe for consumer use.

Question: When it left MTD did it have any defects?

Answer: It did not have any defects in manufacturing or design.

   *   *   *

Question: Mr. Plamper, do you have an opinion based on a reasonable degree of engineering certainty as to whether or nor it is safe to use this wing nut on this mower with this rope guide?

Answer: Yes, I have an opinion.

Question: And what is your opinion?

Answer: My opinion is that it's very safe to use this kind of an application on the mower without any problems.

Question: It's been said in court [by Marty] that the wing nut is subject to vibrating off. Do you agree?

Answer: Well, the vibration on the handle, yes, but this wing nut will not come off when you tighten it. . . .

   *   *   *

Question: Mr. Plamper, based on your knowledge, your experience, your training, and your testing do you have an opinion based on a reasonable degree of engineering certainty as to whether Mr. Goodwin could have been hit with a wing nut while operating the lawn mower in the operator zone [behind the lawn mower] with the [discharge] chute down?

Answer: That it is impossible, including a ricochet.

   Plamper, in over 35 pages of direct testimony, gave numerous examples of why he was of the opinion that the lawn mower was safe and how it complied with all applicable safety standards. Plamper also testified as to the results of the tests he had performed on the same model lawn mower and that his testing confirmed his opinion that the lawn mower was safe. However, the district court refused to allow Plamper to testify as to the

impossibility of a wing nut causing Goodwin's eye injury on the grounds that Plamper was not qualified as a medical expert to testify on the issue. Furthermore, the trial judge excluded, as cumulative, a videotape that MTD wanted to introduce showing Plamper conducting some of the tests that he discussed as well as a videotape of the same model lawn mower being assembled.

Based on the evidence adduced at trial, the jury returned a verdict in favor of Goodwin, finding that MTD was 65% responsible for the accident and that Goodwin was 35% responsible for the accident. As mentioned previously, Goodwin was awarded $603,167.96 plus costs. MTD appeals.

II.  ISSUES

On appeal, MTD argues that the trail judge erroneously: 1) denied its motions for judgment as a matter of law and for a new trial because, according to MTD, the evidence Goodwin presented at trial was insufficient to permit a reasonable jury to find in his favor; and 2) excluded expert testimony.

III.  DISCUSSION
A.  Standard of Review

While we review the denial of a motion for judgment as a matter of law de novo, Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 629 (7th Cir. 1996), this court's inquiry is limited to "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." McNabola v. CTA, 10 F.3d 501, 515 (7th Cir. 1993). "In other words, we are limited to assessing whether no rational jury could have found for the plaintiff." Emmel, 95 F.3d at 630 (citing EEOC v. G-K-G, Inc., 39 F.3d 740, 745 (7th Cir. 1994)). Although we review the denial of a motion for judgment as a matter of law de novo, our review of the denial of MTD's motion for a new trial is under the abuse of discretion standard. Robinson v. Burlington Northern R.R., 131 F.3d 648, 656 (7th Cir. 1997).

With respect to MTD's claim that the

district judge erroneously excluded some of its proposed expert testimony, it is well established that a trial judge has wide discretion in determining both the competency of an expert witness as well as the relevancy of the expert's testimony on a particular subject. Consequently, a judge's decision to limit an expert's testimony "will be overturned on appeal only if manifestly erroneous." United States v. Lanzotti, 205 F.3d 951, 956 (7th Cir. 2000) (citation omitted).

B.   Sufficiency of the Evidence

As mentioned above, the plaintiffs' theory of liability was straightforward. The plaintiffs claimed that MTD was negligent in the use of a plastic wing nut to mount the rope guide because a plastic wing nut was prone (and a steel wing nut with nylon threading was less likely) to become loose due to the vibrations of a gas-powered lawn mower. According to the plaintiffs' theory of the case, the lawn mower's plastic wing nut vibrated loose, was struck and sliced by the mower blade, and was propelled at a high rate of speed out the side chute. After striking the lawn mower blade and being discharged out the downward-facing chute, the wing nut bounced off the ground, struck the siding on the house, and ricocheted into Goodwin's left eye.

In support of their theory, the plaintiffs offered the testimony of three people. Initially, Goodwin testified that he was walking behind the mower while cutting his grass and that the discharge chute was facing downward as directed in the instructions manual. He also stated that after he had been mowing for approximately 20 minutes, and was approximately five feet from his house, he was struck in the left eye by an object. Finally, after his surgery, Goodwin searched the area near the accident and discovered a damaged plastic wing nut which was sliced as a result of its coming into contact with the mower's blade. Furthermore, it should be noted that after the accident and upon inspection of the lawn mower, it was discovered that the mower was missing a wing nut and that the sliced wing nut Goodwin recovered fit the lawn mower exactly where the missing plastic wing nut would have been./3 It is also important to note that Goodwin was the

only eye-witness to the accident and, obviously, the jury must have decided to find his testimony credible concerning where he was walking when he was struck in the eye by the wing nut as well as the position of the discharge chute at the time of the accident. Any attempt by MTD to argue that Goodwin's testimony was insufficient to establish the circumstances which lead up to the accident is meritless because, as we have long held,

[w]e will not second-guess a jury on credibility issues. While this court's review is confined to the "cold pages" of an appellate transcript, the jury had an opportunity to observe the verbal and non-verbal behavior of the witnesses, including the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements . . . . [I]t is not the task of this appellate court to reconsider the evidence or assess the credibility of the witnesses.

Hasham v. California State Bd. of Equalization, 200 F.3d 1035, 1047 (7th Cir. 2000) (citing United States v. Hickok, 77 F.3d 992, 1006 (7th Cir. 1996)).

Not only did the plaintiffs present Goodwin's testimony, but they also presented the testimony of two experts, the board-certified ophthalmologist who performed Goodwin's surgery as well as an engineering expert.

According to Dr. Born,

the broken wing nut [in this case] is a type of projectile consistent with the injury to Mr. Goodwin's cornea. It satisfies that criteria, being large enough to cause a significant blow to the eye and relatively sharp being cut by the lawn mower to cause the slice and injury to the eye.

Thus, the jury was informed by the surgeon that the wing nut in this case was the type of object that could haveinflicted Goodwin's "very unusual" eye injury.

Finally, the plaintiffs also introduced testimony from their expert, Marty.

According to Marty's testimony, the wing nut in this case evidenced that a slice had been inflicted onto it as a result of its coming into contact with the lawn mower blade. Marty also testified that in his opinion the manufacturer's design of a lawn mower that used a plastic wing nut was "defective and unreasonably dangerous" because "the plastic wing nut does not have a locking feature and it can easily unthread if it should loosen." Furthermore, according to Marty, a plastic wing nut was more likely to come loose due to the lawn mower's vibrations than a steel wing nut with nylon threading. Finally, Plamper's (MTD's expert) original report opined that "Goodwin's injury was not the result of a direct hit but rather a ricochet." Although Plamper attempted to recant his previously stated opinion during trial and claim that Goodwin's injury was the result of a direct hit rather than a ricochet, the district court judge aptly noted that "in light of his obvious incentive as the mower's designer to testify in a way that would avoid liability, the jury was free to determine that he had it right the first time."

After reviewing the record, we are of the opinion that the jury's verdict in favor of Goodwin is sufficiently supported by the evidence in the record. Consequently, we agree with the trial judge's rulings on MTD's motions after the verdict and reject MTD's argument to the contrary.

C.  Expert Testimony

MTD also argues that it is entitled to a new trial because the judge committed error in limiting the testimony of its expert. Specifically, MTD argues that Plamper should have been allowed to: 1) introduce videotapes demonstrating what needs to be done to a lawn mower after it is purchased to make it operational; 2) introduce videotape of him performing various safety tests; and 3) testify as to how he believed the accident occurred.
The trial judge summarized his conclusions concerning MTD's proposed expert testimony as follows:

During Plamper's testimony at trial the court sustained objections to his testimony concerning the nature of plaintiff's injury and whether it could

have been caused by the wing nut as theorized by plaintiff. The objection was sustained because there was no foundation that Plamper had any medical expertise which would enable him to competently testify on the degree of injury which a particular object could cause. It was also sustained because Plamper's expert report made no reference to any such opinion. There was no other evidence which would support an opinion that the plaintiff must have been directly in front of the chute. Accordingly, Plamper's proffered testimony on that issue was not expert testimony but speculation and argument unsupported by admissible scientific evidence. Defendant's counsel was free to argue that the accident happened in a different way, but to give that argument the force of expert opinion would have been misleading to the jury and contrary to the limits and purposes of expert testimony.

Plamper testified at great length at trial about thrown objects testing he conducted on the mower. The jury was fully apprised of the results of that testing and Plamper's conclusions from it. A video tape of the testing would have been entirely cumulative, a distraction and a waste of time. This is even more apparent as it concerns the videotape of the mower being assembled. The actual mower was present in court for the jury to examine. The assembly of the wing nut could readily be demonstrated. Nothing was to be gained by showing the video of that process . . . .

Finally, Plamper was free to testify and did testify about vibration testing on the mower. He described the vibration test, the result that nothing vibrated from the mower and specifically offered his opinion based on this test that a properly tightened nut could not vibrate from the mower. . . . The video tape of vibration testing showing that nothing vibrated from the mower would have added nothing helpful to the jury, being cumulative of the testimony and a waste of time.

1. Daubert

In Bourelle v. Crown Equipment Corp., 220 F.3d 532, 536 (7th Cir. 2000)

(footnote in original), this court stated that

[i]n the recent and well-recognized Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed.2d 469 (1993), the Supreme Court held that Fed. R. Evid. 702 imposes on the trial court the obligation, when dealing with expert witnesses, to ensure that scientific testimony is "not only relevant but reliable."/4 In Kumho, the Supreme Court clarified its decision in Daubert and held that "this basic gatekeeping obligation" applies to all expert testimony. 526 U.S. at 147. Thus, the trial judge must determine whether [an expert's] opinion was grounded in the "methods and procedures of science," Daubert, 509 U.S. at 590, 113 S. Ct. 2786, and whether such testimony had sufficient "factual underpinnings," Walker v. Soo Line R.R. Co., 208 F.3d 581, 586 (7th Cir. 2000).

Furthermore, as the Supreme Court elaborated:

The objective of [Daubert's gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

Kumho, 526 U.S. at 152. Also, "[i]t is axiomatic that proffered expert testimony must be 'derived by the scientific method [.]'" Clark, 192 F.3d at 756 (citations and internal quotations omitted).


   2.  Plamper's opinion regarding the cause of the accident

  MTD attempted to introduce Plamper's opinion regarding the cause of the accident. Specifically, MTD wanted to introduce Plamper's opinion: 1) that a wing nut could not have caused the type of eye injury Goodwin sustained; 2) that, contrary to the plaintiff's testimony, Goodwin was not in the operator's zone (behind the lawn mower) when he was injured; and 3) that the discharge chute, which Goodwin claimed was facing down,

must have been facing up for the plaintiff to have been injured in the manner he described.

With respect to Plamper's testimony concerning his opinion as to the impossibility of a wing nut causing the type of eye injury Goodwin sustained, we agree with the experienced trial judge's ruling that Plamper, an engineer, was not qualified to give an expert opinion concerning the nature, scope, or cause of an eye injury that resulted from contact with a wing nut which was discharged at a high rate of speed from a lawn mower. Plamper has neither a medical degree nor any medical training, and an individual with a degree in mechanical engineering is not qualified to give expert testimony on medical questions, including the cause of an eye injury.

MTD also wanted to introduce Plamper's "expert opinion" that he did not believe Goodwin when he stated he was in the operator's zone behind the lawn mower with the discharge chute facing down when he was injured. We agree with the trial judge who properly concluded that, although defense counsel could argue to the jury that the accident occurred in a different way, MTD was not entitled to have an expert give an opinion as to the veracity of Goodwin's testimony concerning the circumstances surrounding the accident when that opinion was merely based on speculation and not on admissible scientific evidence. Any argument by MTD that Plamper was entitled to give expert opinion as to whether he believed Goodwin's testimony that he was in the operator's zone behind the mower with the discharge chute facing down is without merit because an expert cannot testify as to credibility issues. Rather, credibility questions are within the province of the trier of fact, in this case a jury. Hasham, 200 F.3d at 1047 ("We will not second-guess a jury on credibility issues.").

3.  The videos

MTD also argues that it is entitled to a new trial because the trial judge erroneously excluded, as cumulative, videotapes it wanted to show to the jury. Specifically, MTD wanted to show a video: 1) of a lawn mower being assembled; 2) of

Plamper running over various objects with a lawn mower and how the objects were discharged from the mower; and 3) of vibration testing.

However, the decision that the videotapes would be cumulative "rests within the sound discretion of the district court." United States v. Gardner, 211 F.3d 1049, 1055 (7th Cir. 2000) (citing United States v. Kizeart, 102 F.3d 320, 325 (7th Cir. 1996)). And, as we stated in Gardner,

[e]vidence is 'cumulative' when it adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of the trial, with all the potential for confusion, as well as prejudice to other litigants, who must wait longer for their trial, that a long trial creates.

Id. at 1055 (quoting United States v. Williams, 81 F.3d 1434, 1443 (7th Cir. 1996)).

With respect to the video of the lawn mower being assembled, we agree with the trial judge that the use of such demonstrative evidence from a videotape would have been cumulative because the lawn mower was in plain view of the jury and, as the district judge stated, "the assembly of the wing nut [in question] could be readily demonstrated." Furthermore, Plamper essentially testified as to what was necessary in order to make the lawn mower operational after purchase, including the tightening of the wing nuts. We are convinced that the video demonstrating the assembly of the lawn mower would be cumulative and, thus, a waste of the court's and the jury's precious time. The trial judge's decision to exclude the videotape was proper.

MTD also wanted to introduce a videotape of Plamper performing a "thrown object test."/5 Essentially, the videotape demonstrates Plamper steering the lawn mower (with the motor operating) over a variety of objects and how those objects are discharged out the lawn mower. However, Plamper was allowed to testify at great length as to the "thrown object"

tests he performed and the results that were reached. Furthermore, the jury was fully apprised of Plamper's conclusions as a result of the thrown object testing. As this and other courts have held, a trial judge's decision to exclude a videotape of essentially the same subject matter material that the expert had just testified to is not an abuse of discretion and does not warrant a new trial. See, e.g., Finchum v. Ford Motor Co., 57 F.3d 526, 530-31 (7th Cir. 1995); United States v. Falcon, 766 F.2d 1469, 1477-78 (10th Cir. 1985); United States v. McCollum, 732 F.2d 1419, 1423 (9th Cir. 1984). Consequently, the trial judge properly excluded the videotape as cumulative./6

The exact same analysis used above can be applied to the videotape regarding the vibration testing performed by Plamper. Despite MTD's arguments, a review of the transcripts reveals that Plamper testified, at length, concerning his opinion that the plastic wing nut would not come loose due to vibrations if properly tightened. Allowing MTD to introduce a videotape of a lawn mower operating and the wing nut not vibrating loose is not only cumulative of Plamper's testimony but also a waste of the jury's and the court's time. Cases like Finchum, Falcon, and McCollum mandate that the judge's decision to exclude the videotape of the vibration testing be upheld.

We are convinced that the plaintiffs offered evidence sufficient to support the jury's verdict. Furthermore, we are of the opinion that the trial judge did not erroneously exclude any of the videotapes MTD wanted admitted nor did the judge improperly limit the scope of Plamper's testimony.

The decision of the district court is

AFFIRMED.

/1 Although Goodwin was wearing glasses at trial, he testified that he was not wearing any glasses at the time of his accident.

/2 MTD and the Goodwins agreed to have the trial judge read a short narrative as to each of the expert's qualifications. Consequently, there was no direct testimony as to the expert's qualifica-

tions.

/3 Marty opined that the damage to the wing nut was "very consistent with contact with a sharp object such as a lawn mower blade" and that the "cut would have been made once the wing nut detached from the mower and was no longer protected by the handle that it was at one time likely secured to." In fact even MTD's expert admitted that the damage to the plastic wing nut was consistent with having been hit by the mower blade.

/4 Daubert set forth the familiar nonexhaustive list of four factors that are helpful in gauging the reliability of expert testimony: 1) whether the theory is scientific knowledge that will assist the trier of fact and can be tested; 2) whether the theory has been subjected to peer review or publication; 3) the known or potential rate of error and the existence of standards controlling the technique's operation; and 4) the extent to which the methodology or technique employed by the expert is generally accepted in the scientific community. See Daubert, 509 U.S. at 593-94, 113 S. Ct. 2786. However,

[b]ecause the Daubert Court "emphasized that it did 'not presume to set out a definitive checklist or test,' and that the district judge's inquiry should be 'flexible,'" United States v. Vitek Supply Corp., 144 F.3d 476, 485 (7th Cir. 1998) (citation omitted), there is no requirement that the district judgeconsider each one of these "guideposts" when making an admissibility ruling under Fed. R. Evid. 702.

Ancho, 157 F.3d at 515.

/5  The thrown object test is merely a variety of objects being run over by a lawn mower and discharged out the side chute.

/6  We also believe that the proposed thrown object test evidence was irrelevant to the plaintiffs' case. The tests were performed with a different lawn mower, at a different location, in different mowing conditions, and ricocheted off a different house with different siding and foundation. However, given that the trial judge properly excluded the videotapes as cumulative, we need not address this issue.