In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-3406, 01-2337

Sylvia Cruz, et al.,

Plaintiffs-Appellees,

v.

Town of Cicero, Illinois,

Defendant-Appellant.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 3286--George W. Lindberg, Judge.

Argued April 10, 2001--Decided December 19, 2001


Before Coffey, Rovner, and Diane P. Wood,
Circuit Judges.

Diane P. Wood, Circuit Judge.  Armando
Gonzalez, Michael Adams, and Victor Satas
were in the business of condominium
conversions in Cicero, Illinois. In 1999,
they suddenly encountered obstacles
thrown in their path by the Town of
Cicero. They believed that Cicero,
through its president Betty Loren-
Maltese, was applying the laws to them in
an unconstitutional manner. Together with
a number of other people, they sued the
Town, claiming that it had violated their
Fourteenth Amendment equal protection
rights, and a jury awarded them a verdict
of $402,000. Cicero responded first with
motions for a judgment as a matter of law
and a new trial, and then with the appeal
in No. 00-3406. We affirm that judgment
of the district court. Appeal No.
01-2337, which we consolidated with the
first in our order of June 6, 2001,
concerns the district court's award of
attorneys' fees and costs in favor of the
plaintiffs in the principal case. Finding
no abuse of discretion, we also affirm
that order.

I

   Once a jury has rendered a verdict, we
view the evidence in the light most
favorable to that verdict. The account of

the relevant facts that follows should therefore be understood in that light. In 1996, Gonzalez and the other appellees (to whom we shall refer collectively as the Gonzalez parties, unless the context otherwise requires) began purchasing old multi-family apartment buildings in Cicero. They rehabilitated the units in those buildings and then sold the units individually as condominiums. Their only significant competitor in the condominium conversion business was Joe Pav, a well-established figure in Cicero's real estate community and, not coincidentally, the former boss and continuing ally of Betty Loren-Maltese.

Before any person in Cicero sells a piece of property, she must obtain a "real estate transfer stamp" from the Town. The first step toward obtaining the stamp is for the seller to apply for and receive a "certificate of compliance" for the property from Cicero's Building Department. When a property seller submits a request for a certificate of compliance, the Building Department dispatches an inspector to the property to ensure that it is in full compliance with all relevant codes and zoning rules. In the normal course, once an inspector determines that a piece of property is in compliance, issuance of a certificate is a mere formality. The Building Commissioner merely verifies that the inspector found no problems and then directs that the certificate be issued.

Until early 1999, Cicero imposed the same permitting requirements on everyone, including the Gonzalez parties and Pav, and no one was having any trouble passing inspections and getting certificates of compliance for his rehabilitated units. Prior to February of 1999, the Gonzalez parties applied for and received building permits to do restoration work on the units in their buildings and, when the units were ready to be sold, Cicero issued certificates of compliance and real estate transfer stamps. By September of 1998, the Gonzalez parties had sold fifty units in four buildings. Cicero also initially issued certificates of compliance for the units in two of the six buildings that are the subject of this litigation--the Grace and the Warren Park. The Gonzalez parties received certificates for all the units in these two buildings but did not sell four

available units before the certificates expired. Then the trouble began.

The first sign that all was not well came with Gonzalez's original application for certificates of compliance for the units in the Albright, Anna, and Daniel buildings in early February of 1999. Initially, the Building Department simply failed to respond to their applications. When Gonzalez inquired about scheduling inspections, the clerk of the Building Department informed him that his applications had been transferred to the Town's Legal Department. There he was advised that he needed to apply to the Town Board for legal non-conforming use designations for the buildings. This was a curious determination given that Gonzalez had only recently purchased the buildings and the sellers had received certificates of compliance and real estate transfer stamps without difficulty. Not wanting to cause trouble, Gonzalez applied for non-conforming use designations and ultimately received them.

After obtaining the non-conforming use designations, Gonzalez again approached the Building Department about scheduling inspections for the affected units. Inspectors were dispatched to the buildings and filed reports concluding that the units were in compliance with all relevant codes. According to established practice, this should have ended the matter. In fact, both the former Building Commissioner and the Director of Code Enforcement testified at trial that following the inspections they would normally have issued the certificates as a matter of course. But the certificates did not materialize. Gonzalez made inquiries at the Building Department and was again referred to the Legal Department. This time the assistant town counsel told Gonzalez that Loren-Maltese "wanted to know where [their] condominium approval was."

This request was perplexing. Cicero at that time did not have a condominium ordinance, much less any established procedure for acquiring "condominium approval." Not surprisingly, therefore, the Gonzalez parties had not been required to seek any such approval for any of the units they had sold over the previous year. Nonetheless, again trying

to be accommodating, Gonzalez sent Loren-Maltese a letter seeking condominium approval. Loren-Maltese put the issue on the agenda of the next Town Board meeting.

At that meeting, Loren-Maltese made another unprecedented request. She wanted to know if appellees had 1.5 parking spaces for each of the condominium units that they intended to sell. The Gonzalez parties had received separate certificates of compliance for 50 similar units over the past two years without ever having to show the existence of 1.5 parking spaces per unit. And parking had never before been cited as a problem with the current batch of units-- including the units at the Grace and the Warren Park, which already had received certificates of compliance once. Loren-Maltese claimed that the parking requirement was part of a zoning provision that had been on the books long before Gonzalez began doing condominium conversions. That ordinance required 1.5 parking spaces per unit constructed or "substantially altered" after 1977.

The buildings owned by the Gonzalez parties had been constructed before 1977, and the phrase "substantially altered" had never before been interpreted to include the kinds of renovations they had made. Among other things, they had not added units, changed the configuration of the units, or made any other structural changes to the buildings. In essence, they had made cosmetic improvements and were proposing to change the ownership structure of the buildings. The renovations on the six buildings for which Gonzalez was now allegedly required to provide parking were no different from the renovations he had completed on the other buildings that had received certificates of compliance without difficulty. At trial, no Cicero official, including Loren-Maltese, could define "substantially altered."

Following the Town Board meeting, Loren-Maltese directed the Economic Development Committee to determine how much parking was available at Gonzalez's buildings. Gonzalez never contended that he could satisfy the 1.5 spaces requirement, so it was no surprise when the Economic Development Committee reported to the Town Board that the number of spaces fell

short of the alleged requirement. Loren-Maltese thereupon instructed Gonzalez that he could not sell the units unless he obtained a variance from the Zoning Board, which was headed by her friend and long-time political supporter Anthony Accardo. Gonzalez dutifully applied for the variances but was turned down. This had the effect of shutting down his condominium conversion business.

To someone unaware of Cicero's history, all of these new requirements and shifting standards might have appeared rational enough but for two anomalies. The first was that at the same time that the Gonzalez parties were being subjected to the new regime, Joe Pav and others continued to do business under the old rules. Between February and April of 1999, Pav applied for certificates of compliance for units in his Morton Park building. This was an old multi-family rental building that Pav had rehabilitated and (like the Gonzalez group) was now selling as individual condominiums. The project was completed with much fanfare, including a ribbon-cutting ceremony personally attended by Loren-Maltese. Pav's applications for certificates of compliance for these units sailed right through the Building Department, without any detours to the Town Hall or the Legal Department. Inspectors were promptly dispatched and reports were issued finding the units to be in compliance. Finally, Pav received certificates approved by Loren-Maltese's self-described "best friend," Mary Lynn Chlada, the head of the Building Department. Pav was not required to obtain "condominium approval" for the conversions. Also tellingly, he received the certificates even though his Morton Park building had undergone essentially the same renovations as the Gonzalez buildings and lacked the allegedly required 1.5 parking spaces per unit. Similarly, Hector Garcia, a real estate broker in Cicero, had no trouble obtaining a certificate of compliance on April 20, 2000, for a six-unit rental building that he sold after a renovation similar to Gonzalez's. Garcia's building had three off-street parking spaces--six fewer than what Loren-Maltese had claimed to Gonzalez was de rigeur.

The second anomaly related to the timing and reason for the new requirements the

Gonzalez parties were forced to satisfy. It turned out that the difference in treatment between them and others like Pav and Garcia was not accidental. Instead, it arose out of a breakdown in Gonzalez's professional relationship with Loren-Maltese. In 1998, Cook County approached Gonzalez about finding rental space for a new Women, Infants, and Children (WIC) office in Cicero. Gonzalez eventually negotiated a lease with the County for space in one of his buildings. The Town of Cicero, however, needed to approve the lease and Gonzalez was told Loren-Maltese had decided to block the deal. Gonzalez scheduled a meeting with Loren-Maltese at which she acknowledged that this was true. Gonzalez attempted to persuade her to approve the lease, and by the end of the meeting, Loren-Maltese was non-committal. She told Gonzalez to expect a call from Edward Vrdolyak, a former Chicago alderman with no official position in the Town of Cicero.

Shortly thereafter, Vrdolyak summoned Gonzalez to his Chicago office. As the two talked, Vrdolyak assured Gonzalez that Loren-Maltese was his "friend," that she would help him, but that Gonzalez should "take care of her." Not long after this meeting, Loren-Maltese permitted the lease to go through. She later testified that she had done Gonzalez a "million-dollar" favor (as opposed, we suppose, to making a decision in the best interest of the Town). Gonzalez, however, apparently did not get the message Vrdolyak was trying to send. Instead of a more valuable show of gratitude, Gonzalez sent Loren-Maltese a bouquet of flowers. This proved to be insufficient. Not long after, the question of his certificates of compliance for the condominium units at issue in this case came to a head.

Believing that his inability to obtain certificates of compliance was the result (at least in part) of Loren-Maltese's dissatisfaction with his chosen method of thanking her for her assistance on the WIC lease, the Gonzalez parties filed a complaint alleging that their rights had been violated in a number of ways, including through Cicero's violation of their equal protection rights under the Fourteenth Amendment. Upon the recommendation of a magistrate judge, the district court denied the plaintiffs' request for a preliminary injunction in an order issued April 6, 2000. The

parties then filed cross-motions for summary judgment. The district court denied Gonzalez's motion and granted Cicero's motion on all claims except the one based on the equal protection clause. Cicero filed a motion for reconsideration, which the district court denied August 7, 2000. As we have already noted, a jury trial ensued, the jury found for the plaintiffs on the equal protection claim, and it awarded them damages in the amount of $402,000. Cicero filed motions for a judgment as a matter of law or, in the alternative, for a new trial under Fed. R. Civ. P. 50 and 59. The district court denied these motions on September 7, 2000, and this appeal followed.

II

Cicero has chosen on appeal to tackle the sufficiency of the evidence to support the jury's verdict--a daunting task, given the deferential standard that applies to such reviews. It also complains that the district court mistakenly admitted certain testimony with regard to damages and that it was entitled to what it calls an "itemized jury verdict"-- apparently, in context, this means Cicero believes the district court abused its discretion when it did not submit special interrogatories under Fed. R. Civ. P. 49 with respect to damages. We will take each argument in turn.

A.   Sufficiency of the Evidence

1.   Equal Protection Violation

Although Cicero filed motions for judgment as a matter of law and for a new trial with the district court, it has framed its challenge on appeal to the equal protection verdict only in terms of whether, based on the evidence presented at trial, a reasonable jury could conclude that Cicero committed an equal protection violation. This formulation of the standard of review applies only to the denial of a motion for judgment as a matter of law. Kossman v. Northeast Ill. Reg'l Commuter R.R., 211 F.3d 1031, 1036 (7th Cir. 2000). Cicero has thus waived any argument that it was entitled to a new trial because the jury's verdict was against the manifest weight of the evidence, a claim we would review for abuse of discretion. See Trzcinski v.

American Cas. Co., 953 F.2d 307, 315 (7th Cir. 1992). We are particularly comfortable finding waiver in this case because Cicero failed to include the district court's judgment(s) denying its post-trial motions in its Rule 30(a) appendix. Not only is this sanctionable misconduct, Collins v. Educ. Therapy Ctr., 184 F.3d 617, 622 (7th Cir. 1999), but it forces us to infer from the arguments in Cicero's opening brief which of the district court's judgments Cicero has chosen to appeal. As we read its brief, Cicero is claiming only that it was entitled to judgment as a matter of law.

We review de novo a district court's denial of a motion for judgment as a matter of law. Goodwin v. MTD Products, Inc., 232 F.3d 600, 605 (7th Cir. 2000). Our inquiry is limited to determining whether, when viewed in the light most favorable to the non-moving party, the evidence presented at trial, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the jury's verdict. Id. at 606.

After setting out the facts in the record in the light most favorable to its own position, Cicero spends much of its opening brief asserting that this was a "garden variety zoning dispute" that had no business being in federal court. While it is true that this characterization appears in a number of cases involving challenges to land-use decisions, see Hartland Sportsman's Club, Inc. v. Town of Dalefield, 35 F.3d 1198, 1199-1200 (7th Cir. 1994); Coniston Corp. v. Village of Hoffman Estates, 844 F.2d 461, 467 (7th Cir. 1988), these are not magic words that municipal defendants can simply recite in order to insulate their land-use decisions from scrutiny under federal law. Whether Cicero is entitled to judgment as a matter of law depends on the facts in the record construed favorably to the Gonzalez parties, not on convenient quotes applied to a version of the facts rejected by the jury. (At one point Cicero was also arguing that the district court erred when it refused to grant summary judgment on the equal protection claim. This effort was misguided. Once a trial on the merits has occurred, we rely on the record developed at trial and will not review an earlier

denial of summary judgment. Marshall v. Porter County Plan Comm'n, 32 F.3d 1215, 1220 (7th Cir. 1994). The Town wisely abandoned this argument in its reply brief.)

Gonzalez was proceeding under the "class of one" Equal Protection theory recognized by the Supreme Court in Village of Willowbrook v. Olech, 528 U.S. 562 (2000). In Olech, the Court explained that "the number of individuals in a class is immaterial for equal protection analysis." Id. at 564 n. *. A plaintiff succeeds on a class of one claim by demonstrating that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id. at 564. In Hilton v. City of Wheeling, 209 F.3d 1005 (7th Cir. 2000), we interpreted Olech to require that the plaintiff present evidence that "the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." Id. at 1008. "The Equal Protection Clause provides a remedy when a powerful public official pick[s] on a person out of sheer vindictiveness," or because of a "totally illegitimate animus" toward the plaintiff. Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001) (internal citations and quotations omitted).

Cicero's only challenge to the jury's verdict is that the Gonzalez parties failed to present enough evidence that the decision not to furnish certificates of compliance to them after February of 1999 was motivated by "totally illegitimate animus." Cicero argued this point aggressively during closing arguments (and the court gave a "totally illegitimate animus" instruction), but the jury disagreed, finding that precisely that animus motivated the Town's stance toward these developers. On the record before us, we cannot say that no reasonable jury could have reached this conclusion. (Indeed, as the following account demonstrates, we are satisfied that a challenge based on the weight of the evidence would also have failed, had this argument been preserved.)

The evidence read in the light most

favorable to the jury's verdict established that in 1998 and early 1999, there were two dominant players in the Cicero condominium conversion business, the Gonzalez parties and Pav. Until early 1999, Cicero imposed the same requirements on everyone. No one was asked to obtain "condominium approvals" prior to the issuance of certificates of compliance, and no one had to demonstrate that he had 1.5 off-street parking spaces available for each rehabilitated unit he intended to sell. That changed in February of 1999 in the manner we have already described. While Pav continued to receive certificates of compliance under the old rules, Gonzalez was subjected to a series of unprecedented requirements, many of which were substantively questionable--like requiring "condominium approval" in the absence of any ordinance or policy creating such a requirement-- and all of which the jury reasonably could have inferred were traceable to Loren-Maltese and to her personal hostility toward Gonzalez--a hostility reflecting precisely the "sheer vindictiveness" called for in Albiero.

The jury heard testimony that Loren-Maltese personally controlled land-use regulation in Cicero and reached her decisions on at best questionable personal grounds. By late 1998, she had installed her closest friend, Mary Lynn Chlada, as Director of Code Enforcement, even though Chlada had no experience with land use and zoning issues. Loren-Maltese then transferred to Chlada all the powers formerly vested in the Building Commissioner, including the power to issue certificates of compliance. She appointed the former Building Commissioner, Anthony Accardo, to a paid position heading the Zoning Board as a "favor." Accardo, also a loyal supporter of Loren-Maltese, testified that he would never challenge her authority. Loren-Maltese herself corroborated her willingness and ability to personalize land-use decisions when she acknowledged that she had first blocked Gonzalez's WIC lease and then decided to "help" him by letting it go through--although, as later events proved, not with a "free pass."

The jury also heard evidence suggesting that Loren-Maltese considered it perfectly acceptable to expect those who benefitted from her position as Town

President to give financial support to her political campaigns. There was testimony at trial that city officials approached local businesses needing cooperation from the Town of Cicero and encouraged them to purchase large numbers of $65 golf-outing tickets in support of Loren-Maltese's local Republican Party. Loren-Maltese acknowledged that to raise money for her re-election efforts, she relied on the "loyalty of [her] friends," including Accardo, whom she repaid by naming him to be the (paid) Zoning Board Chairperson. Accardo, she admitted, had "over the years been loyal" and raised money for her campaigns. When challenged about this practice, Loren-Maltese responded, "That's just politics." A reasonable jury could have concluded from Loren-Maltese's testimony that this kind of "loyalty" was an important qualification for obtaining positions in Cicero's government and for obtaining other public benefits as well.

In this context, it was reasonable to believe that Loren-Maltese could and would, under the appropriate circumstances, use her control over land-use regulation in Cicero to serve her personal ends through the unequal application of the laws. And the Gonzalez parties presented substantial evidence that this was precisely what happened to them. The jury could reasonably have inferred from the testimony about the favor to Gonzalez that was brokered by Vrdolyak that Loren-Maltese expected Gonzalez's thanks to take the form of a financial contribution. Vrdolyak had no official position in Cicero government, much less a formal role in its land-use decisions, and so his involvement was suspicious at best. What need was there for Vrdolyak's participation if Loren-Maltese intended to make her decision based simply on the best interests of the Town of Cicero? The dubiousness of his role in the matter was confirmed by his statement to Gonzalez that Loren-Maltese was his friend and would help him, but that Gonzalez needed to "take care of her." A reasonable jury could conclude from this evidence that Loren-Maltese involved Vrdolyak as an intermediary to convey her expectation that Gonzalez show the kind of loyalty she expects from friends for whom she does million-dollar favors.

Given the evidence in the record of the unprecedented, selectively applied, and substantively questionable standards that Loren-Maltese imposed on Gonzalez shortly after Gonzalez attempted to "take care of her" with a bouquet of flowers, a reasonable jury could also have concluded (as this one did) that the trouble the Gonzalez parties had obtaining certificates of compliance for their units in early 1999 had nothing to do with a lack of "condominium approval" or available parking. Instead, these troubles stemmed from Loren-Maltese's desire to punish Gonzalez for not repaying her "help" on the WIC lease with a significant financial contribution of some kind.

Hostility stemming from a person's failure to contribute to a politician's campaign fund, or otherwise reward her personally for permitting access to government services, falls in the category of "totally illegitimate animus"; this motivation was not related to Loren-Maltese's duties as Town President and it is not a reason to deny certificates of compliance that is rationally related to a legitimate government interest. As Cicero argues, there is certainly evidence in the record which, if believed by a jury, would have put this case in the category of a run-of-the-mill zoning dispute. But the jury was not persuaded by that evidence and we cannot say that its decision was unreasonable.

## 2. Evidence of Damages

Cicero next argues that the district court erred in permitting the Gonzalez parties "to present their alleged damages by use of inadmissible hearsay." In general, we will not reverse a district court's evidentiary ruling unless we find that the court abused its discretion. Palmquist v. Selvik, 111 F.3d 1332, 1339 (7th Cir. 1997). The burden is still greater, however, where the appellant seeks to set aside a jury verdict in a civil case. Even if the district court erred, we will only set aside a jury verdict if the appellant demonstrates that the error was not harmless, i.e. that it affected appellant's substantial rights. Mason v. Southern Ill. Univ. at Carbondale, 233 F.3d 1036, 1042-43 (7th

Cir. 2000); Fed. R. Civ. P. 61, Fed. R. Evid. 103(a).

The testimony at issue was given by appellee Michael Adams, a Cicero real estate broker and an equity interest holder in the buildings that are the subject of this litigation. Cicero contends that Adams's testimony on damages should have been excluded in its entirety. Without it, Cicero continues, the Gonzalez parties could not demonstrate that they had "ready, willing and able buyers" for all of their units and thus could not support their claim for damages. This is how, in Cicero's view, the allegedly erroneous admission of Adams's testimony affected its substantial rights.

We find that Cicero's arguments miss the mark in several ways. Gonzalez and his colleagues sought consequential damages of between $1.1 and $1.3 million. Of that, $643,802 represented carrying costs for the units that had gone or were ready to go on the market but could not be sold because of the lack of certificates of compliance. The Gonzalez parties presented documentary evidence of what it cost to maintain units as long as they were not sold. They relied on Adams to estimate how long it would have taken to sell the units once they were placed on the market. Adams had been a licensed real estate broker in Cicero for seven years at the time of the trial. Starting in 1996 he was heavily involved in converting condominium units in Cicero. On this basis the district court found Adams competent to give lay expert testimony regarding the Cicero condominium market under Fed. R. Evid. 701, without objection from Cicero.

When asked how he picked the dates on which carrying cost damages began to accrue for the various units, Adams explained that based on his knowledge of the Cicero condominium market--including his marketing and sale of 75 condominium units--it would generally take three to four months from the time the unit went on sale to the time of closing a deal. He specifically mentioned his experience selling units in the Dalia Condominiums. The Dalia was, according to Adams, "a building similar to [the Daniel]." In "a three and half month period, from the time we started marketing, we closed

[i.e., sold] all 18 units." Adams made clear that the three to four month period--not the existence of any particular contracts on the units--was the basis for estimating damages. Again, Cicero did not object to any of this testimony below or on appeal.

Cicero's sole objection was to testimony Adams offered regarding the existence of contracts on specific units prior to the Town's decision to stop issuing certificates of compliance. On several occasions during his testimony, Adams mentioned that contracts existed on many of the units that were the subject of this litigation. On cross examination, Adams acknowledged that his belief that he had contracts for the units was based on conversations that he had with loan officers and title companies regarding the availability of financing and the setting of closing dates. Adams testified that this was the normal means by which he would obtain such information. Cicero objected that Adams's testimony was hearsay, that he had no independent knowledge of the existence of the contracts and was asserting for the truth of the matter what others had told him. The district court concluded that this was hearsay but that it was sufficiently reliable to be admitted under Fed. R. Evid. 807, the catch-all exception to the hearsay rule.

We need not decide whether this was error, because even if it was, it did not affect Cicero's substantial rights. The district court recognized Adams as a lay expert under Fed. R. Evid. 701, competent to testify on the Cicero condominium market. Cicero did not object to this determination below and it has not raised the issue on appeal. As a lay expert, Adams explained that based on his history of selling condominiums in Cicero, he calculated the damages date not based on the existence of contracts for the units in the various buildings, but rather according to when they were ready to go on the market. With Adams' lay expertise unchallenged, we find no merit in Cicero's contention that because Adams's testimony regarding the existence of con tracts may have been based on hearsay, all his damages testimony should be excluded.

There is similarly no merit to Cicero's

claim that Gonzalez's damages estimate depended on demonstrating the existence of contracts on each of the units in each of the buildings. It was enough for Gonzalez to create a rational basis for a damages estimate in the case. Bruso v. United Airlines, Inc., 239 F.3d 848, 856 (7th Cir. 2001) (jury's damages award will be upheld if it is rationally related to the evidence in the record). We reject Cicero's contention that the appellees "cannot claim damages for costs on units when they acknowledge that buyers for those units did not exist." Gonzalez presented competent evidence, unrebutted by Cicero, that had he been able to obtain the certificates of compliance it would have taken three to four months to find buyers and close the sales on those units. Requiring him to have actual buyers in circumstances such as these would effectively prevent recovery since Gonzalez could hardly have entered into contracts with prospective buyers knowing that he would be unable to get the permits necessary to sell the property. To the extent that the lack of actual buyers was a result of Cicero's unconstitutional actions in denying the requisite permits and approvals, Cicero is estopped from relying on those grounds to dispute the damages. Adams's testimony regarding the existence of the contracts on individual units simply reinforced the validity of his three to four month estimate. Cicero has not argued, nor could we find, that this reinforcement affected its substantial rights. We thus conclude that any error committed by the district court in admitting the one part of Adams's testimony to which Cicero objected was harmless.

B. Rule 49 Special Interrogatories

Whether or not to grant a party's request to submit special interrogatories (either on all issues or on a subset of issues like damages) is committed to the sound discretion of the district court. Bularz v. Prudential Ins. Co., 93 F.3d 372, 377 (7th Cir. 1996). Cicero alleges that the district court abused its discretion by refusing to submit interrogatories regarding damages. It argues that Gonzalez's damages were "speculative" and that an itemized verdict "would be the only reasonable way to determine that the jury was not

impermissibly awarding punitive damages" instead of compensatory damages. Cicero cites not a single case in support of its argument and we reject it. Especially in light of the fact that damages in this case were not unusually speculative and that the jury awarded only a third of the actual damages it reasonably could have, Cicero's argument, if accepted, would entitle parties to itemized damages verdicts on demand. Fed. R. Civ. P. 49 gives the district court the discretion to submit a general verdict, Hibma v. Odegaard, 769 F.2d 1147, 1157 (7th Cir. 1985), and it did not abuse its discretion by doing so in this case.

III

Finally, we turn to the attorneys' fees appeal, No. 01-2337. In a minute order entered on April 30, 2001, the district court awarded the plaintiffs $298,485.25 in attorneys' fees and $14,495.52 in costs. Later, on May 16, 2001, the court amended the fee portion of the award by adding another $14,397.75 to it, which resulted in a total fee award of $312,883. Although Cicero did not dispute that the plaintiffs were entitled to an award of $222,819.25 in attorneys' fees and $10,591.55 in costs, it objected to anything over those amounts. It has appealed from the April 30 and May 16 orders of the district court, to this extent.

Attorneys' fees are available in cases brought under 42 U.S.C. sec. 1983 pursuant to 42 U.S.C. sec. 1988. This court reviews a district court's award or denial of fees under sec. 1988 using the deferential abuse of discretion standard, unless the decision is challenged on the basis of a mistake of law. Jaffee v. Redmond, 142 F.3d 409, 412 (7th Cir. 1998). Our review of a cost award proceeds under the same standard. Cengr v. Fusibond Piping Sys., Inc., 135 F.3d 445, 453 (7th Cir. 1998). This standard makes sense for a number of reasons: the district court is more familiar with the work the winning attorneys devoted to the case; review of a fee petition is a highly fact-specific exercise; and the district court has a full appreciation of both the factual and the legal history of the case (including those parts that have dropped out by the time an appeal reaches this court). In this case, Cicero offered several reasons before the district court

in opposition to the amount of fees it awarded: first, it claimed that plaintiffs did not recover everything they wanted, including particularly a preliminary injunction, and that they should not be compensated for hours spent on unsuccessful work; second, it argued that certain fees were duplicative or excessive; and finally, it noted that appeal No. 00-3406 was pending and that there was still a chance that the plaintiffs might not be "prevailing parties" if it succeeded here. Argument 3 is obviously no longer available, since we have decided to affirm the judgment of the district court in the underlying case. As for Argument 2, the district court reviewed the specific entries to which Cicero objected and found that they were neither improperly duplicative nor excessive. After our own review of the record of this case, we see no reason to second-guess that decision.

Finally, Argument 1 attacks the degree of the plaintiffs' success. While a district court may not mechanically reduce a lodestar amount based on the fact that a plaintiff does not prevail on every theory and every demand, Cole v. Wodziak, 169 F.3d 486, 487 (7th Cir. 1999), in some cases plaintiffs prevail on such an insignificant part of the case that a district court may make an adjustment to ensure that compensation is not awarded for entirely unsuccessful work, such as a mere recovery of nominal damages. Id. This, however, is unequivocally not such a case. The court rightly rejected Cicero's argument that plaintiffs' failure to win a preliminary injunction somehow diminished their right to fees. Given the fact that the plaintiffs ultimately won an injunction against the Town, Cicero's argument rings hollow. As the district court put it, "[i]t is the ultimate outcome of the litigation that determines whether a plaintiff is a prevailing party, not his or her success as to each motion filed in the case." With respect to the damages award, the fact that the jury did not award the full amount that the plaintiffs sought does not automatically mean that the fees had to be discounted, either. The jury's award of $402,000 was certainly not a nominal one, and the district court was well within its discretion to regard this as a bona fide victory for the plaintiffs. We thus see

no reason to disturb the district court's decision to award both the fees and the costs that the plaintiffs requested.

IV

A jury concluded that the Town of Cicero, through its President Betty Loren-Maltese, shut down the business of the Gonzalez parties for illegitimate and vindictive reasons. The record contains more than enough evidence to support this conclusion. Cicero has not identified any injury to its substantial rights from the district court's evidentiary rulings, and it has certainly not established that the district court abused its discretion by refusing to submit special interrogatories on damages. Finally, the district court's order on attorneys' fees and costs was within its discretion. We therefore Affirm the judgment in No. 00-3406 and the orders in No. 01-2337.

One last piece of business remains. As we explained above, Cicero violated Circuit Rule 30(a) when it failed to include the district court's judgment(s) denying its post-trial motions in its Rule 30(a) appendix. We have held in the past that this is sanctionable misconduct, see Collins v. Educ. Therapy Ctr., 184 F.3d 617, 622 (7th Cir. 1999). We hereby issue an ORDER TO SHOW CAUSE to Cicero to file a memorandum within 10 days of the date of this opinion explaining why it should not be sanctioned for this violation of the rules.